# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

In re:                                                                Bankruptcy No. 10-37695
                                                                      Chapter 11 Case

**Gerald Trooien a/k/a**
**Gerald Lee Trooien a/k/a Jerry Trooien,**

                    Debtor.

## GE CAPITAL'S REPLY TO DEBTOR'S OBJECTION TO GE'S MOTION TO CONVERT OR DISMISS

There comes a time in certain bankruptcy cases when the Court must step in, take charge, and end a case that is harming the creditors. This is such a case and this is now that time.

After months in chapter 11 and hundreds of thousands of dollars in legal fees, the Debtor[1] has presented two proposed plans to the Committee. One of these plans is the financial equivalent of placing all the estate's liquid assets on nineteen black and giving the roulette wheel a spin. The other plan proposes liquidating the estate but gives no indication that such can be accomplished more efficiently and cost-effectively than in a chapter 7. Neither of these plans is ready to be presented to the Court and the creditors for approval of a disclosure statement. Meanwhile, the estate incurs administrative expenses of breath-taking scale with no end in sight.

Debtor has no likelihood of rehabilitation. The estate continues to suffer losses, and Debtor's failure to file certain necessary reports is unexcused. More critically, however, Debtor's working plans demonstrate no likelihood of success and are not legally feasible. Finally, Debtor's Objection to GE Capital's Motion to Convert or Dismiss Chapter 11 Case (the

---

[1] Capitalized terms not defined herein have the same meaning as scribed to them in the Memorandum in Support of GE Capital's Motion to Convert or Dismiss Chapter 11 Case. (Docket No. 115).

"Response") lacks evidence or other support to demonstrate that the Debtor's petition was not filed in bad faith.

## I.     The Losses to the Estate Are Continuing and Substantial.

Debtor argues in response to evidence establishing continuing losses and diminution of the estate that the bleeding is slowing. Specifically, Debtor argues that certain tasks of professionals such as the drafting of schedules will not be repeated, and thus losses from professional fees are not "continuing." (Docket No. 136, ¶ 32). Debtor additionally argues that the costs incurred by professionals in evaluating the real estate projects and negotiating with secured lenders of those projects will ultimately add value to the estate. (Docket No. 136, ¶ 35).

Debtor's arguments are unavailing. Although certainly the professionals will not be duplicating efforts as to some of the work required in the administration of a chapter 11, it is apparent that the professionals are nowhere closer to formulating a plan of reorganization than they were three months ago when debt restructuring proposals were submitted to the secured lenders of the real estate projects. Six of the nine real estate projects identified to fund a plan of reorganization are currently in foreclosure and/or the secured lender has indicated its intention to pursue its remedies rather than negotiate. (Docket No. 139, Affidavit of Gerald Trooien, Ex. A). The possibility of successful negotiation becomes increasingly remote as Debtor continues to allow unpaid monthly debt service payments and real estate tax arrearages to mount. At this juncture, it is more apparent than ever that the efforts of the professionals to put together a plan using the non-debtor real estate projects are a waste. Ongoing efforts to reorganize that which cannot be reorganized causes continued losses to the estate with no foreseeable benefit.

N:\PL\80350\80350-022\1207008.DOC

II. **Debtor's Unexcused Failure to Timely File Reports Required by Fed. R. Bankr. P. 2015.3 Establishes "Cause" under 11 U.S.C. § 1112(b)(4)(F).**

Debtor is not excused from filing reports required by Rule 2015.3. Debtor contends that justifiable excuse exists for his failure to file these reports because his "software could not generate reports" to provide the information required under the rule. (Docket No. 136, ¶ 64). This same allegedly deficient software, however, did not prevent Debtor from sharing the financial information with Manchester or the Committee. (Docket No. 136, ¶¶ 16-18 (stating that Debtor has provided "detailed information" of the entities owning the real estate projections, which included "historical information and projections")). In fact, cash flow reports and income and loss statements of the non-debtor real estate entities appear to have been the primary resource relied upon in creating the initial proposed plans. See Docket No. 140, ¶ 7.

Considering the time dedicated to preparing "considerable financial information on the Projects" and a 102-page report for the Committee's review, Debtor's professionals could have and should have found the time and resources to provide the required Form 26 reports by now. (Docket No. 136; Docket No. 140, ¶ 8). For whatever Debtor's reason for not filing these disclosures,[2] failure to do so is unexcused and constitutes cause to dismiss this case.

III. **Debtor's Proposed Plans Are Implausible.**

The plans proposed by Debtor further establish that the estate lacks a reasonable likelihood of rehabilitation. Neither plan is plausible.

Debtor asserts with respect to his plans that GE Capital makes "sweeping generalities," that GE Capital fails to acknowledge that the plans jettison the non-profitable entities, and that

---

[2] Debtor's failure to submit this financial information is important, for it has created a smoke screen to the ultimate question of whether there is any equity available to Debtor in connection with his ownership of the entities. Presumably the answer is no, for Debtor's schedules reveal that the estimated net equity of the Debtor's interest in all but two of the entities at the time of filing was zero. (*See* Docket No. 38 at Schedule B).

N:\PL\80350\80350-022\1207008.DOC

GE Capital uses old statements and estimates by Debtor to attack new statements and estimates by Debtor. (*See, e.g.*, Response, at 14). Debtor is wrong. GE Capital focuses in its Motion and here first on the shortcomings of Debtor's initial plan, then on the shortcomings of his subsequent plan. In doing so, GE Capital both recognizes that Debtor plans to abandon certain of the projects and utilizes the most up-to-date information and speculations of Debtor's consultants. (*Id.* (noting that the projections contained in the "Manchester final report" are "dependant on negotiations with lenders")).

Debtor's first plan as proposed to the Committee depends on four critical yet implausible assumptions:

1. **Unlikelihood of Concessions by C-III**. The plan assumes that C-III, holding the debt on the only three projects Debtor has identified as having "significant positive cash flow," will agree to a reduction of approximately $70,000 of the total monthly debt service payments due on these projects and will advance an additional $400,000 to pay for cash shortages of 9800 Bren Road. (Docket No. 140, Affidavit of Patty Smith, ¶ 10-11). There exists no rational business reason for C-III to allow these concessions when, as Debtor suggests, there is additional cash flow available to pay the outstanding debt. C-III is better off commencing foreclosure of these properties than subsidizing a plan of reorganization for Debtor by accepting a lower interest rate and advancing more funds to a delinquent project. Indeed, proceeding with the foreclosures is precisely what C-III has chosen to do. (*See* Docket No. 139, Declaration of Gerald Trooien, Ex. A).

2. **Real Estate Taxes**. The plan assumes that the delinquent real estate tax liability in excess of $2.3 million will be paid from the projected net cash flow of the three C-III projects in 9.4, 16.8, and 8.4 years, respectively. These payoff projections, however, depend on C-III's acquiescence in a significant reduction of the debt service payments due on the projects; fail to account for any past or future accumulated interest and penalties related to the real estate tax arrearages; and do not appear to account for any future capital improvements and maintenance of the properties. (Docket No. 140, Affidavit of Patty Smith, p. 11). Thus, the projected pay-off of these real estate delinquencies from the cash flows of the projects would likely take more time than projected and would further delay any payout to creditors of this estate.

3. **Phantom Cash Flows to Pay Principal Payments**. The plan assumes that $418,800 generated from the cash flow of the C-III projects will pay off, in part,

N:\PL\80350\80350-022\1207008.DOC

delinquent mortgage payments due to C-III. The proposed plan, however, fails to explain the source of this money.

4. **A Significant Cash Investment of the Estate.** The plan assumes that the estate will advance $837,600 to pay delinquent mortgage payments due to C-III with no projection of when any payoff of this loan would be realized. If, as Debtor represents, these real estate projects will eventually be profitable, then the entities should be able to find additional financing *now*, which in turn could fund a plan.

Debtor's second plan acknowledges that the creditors may not like the Vegas-style odds necessary to accomplish his first plan, and proposes instead a distribution of cash to the creditors and "some value" from certain real estate projects. (Docket No. 136, ¶ 21; Docket No. 139, Affidavit of Gerald Trooien, ¶ 6). The details of the plan are not disclosed; rather, Debtor shares only that this plan "can be accomplished in the chapter 11 plan process (subject to the determination of the preference issue) and result in a quicker distribution and lower expense than a chapter 7 liquidation." (Docket No. 136, ¶ 21). Apparently, Debtor invites this Court and the unsecured creditors to trust his word on blind faith that a quicker and cheaper distribution could be made by the chapter 11 process.

Furthermore, Debtor's assertion that a liquidating plan would depend on the determination of the GE Capital preference action is an overstatement at best given the tenuous state of the entities that are subject to the charging order. Evidence in the record suggests that Debtor has zero equity interest in the non-debtor entities as the secured lenders of these projects are undersecured. (Docket No. 136, ¶ 8 ("Without exception or almost without exception, these lenders are undersecured . . . .")). Accordingly, GE Capital's liens, whether avoided or not, may have no value.

IV. <u>**Bad Faith Exists to Establish Cause**</u>

The burden is on the debtor to establish that his voluntary petition was filed in good faith. *In Matter of Strug-Division, LLC*, 375 B.R. 445, 448 (Bankr. N.D. Ill. 2007) (citing *Stage I Land*

*Co. v. United States*, 71 B.R. 225, 229 (D. Minn. 1986)). For the reasons stated in GE Capital's Motion and the reasons stated below, Debtor has not met his burden to establish a good faith filing.

A.   The Nazca Sale.

Debtor's own declaration suggests that he had knowledge of the forthcoming sale of Nazca Solutions in April of last year. Despite Debtor's representation to his creditors at that time that his $3.3 million note receivable from Nazca Solutions was not currently collectible, Debtor continued to loan it money. (Docket No. 139, ¶ 4). A "letter of interest" to purchase the company was signed by the buyer in July 2010. (*Id*.). Like most multi-million dollar acquisitions, this transaction presumably did not occur overnight and Debtor—a 46 percent shareholder, board member and creditor of the company—was likely intimately involved in the negotiations leading up to the July commitment of the buyer and the ultimate sale of the business. These facts and circumstances suggest that the voluntary disclosure of confidential information in April 2010 was an effort to provide a respite on collections actions as to the Nazca Solutions receivable to ensure that sale and/or marketing of the company was not disrupted.

B.   The Plan Is Not Legally Feasible.

Debtor fails in his effort to distinguish *Strug-Division*. In the Motion, GE Capital establishes that *Strug-Division* based its finding of bad faith and dismissal on the intentions of the limited liability company debtors to fund reorganization plans by utilizing proceeds of real estate owned not by them, but owned by *separate* limited liability companies in turn wholly owned by them and *purposefully not included in the bankruptcy filing*. (*See* Motion, at 19–20). Debtor counters by arguing that GE Capital's reliance on *Strug-Division* is "misplaced," for,

N:\PL\80350\80350-022\1207008.DOC

Debtor maintains, the basis of that holding was *not* that the entities owning the real property were not included in the bankruptcy, but rather that the *individual owner* of the two debtor entities was not *himself* subject to the bankruptcy count's jurisdiction. (*See* Response, at 17–18). Since Debtor himself has in fact filed bankruptcy in the case at bar, Debtor concludes, Debtor is subject to this Court's jurisdiction and *Strug-Division* is inapposite.

Debtor misstates the holding and rationale of *Strug-Division*. It was *not*, as Debtor maintains, the failure of the *individual* to subject himself to the jurisdiction of the bankruptcy which provided the basis for the court's decision. Rather, it was the failure to subject the *properties themselves* to the court's jurisdiction which resulted in the finding of bad faith and dismissal. 375 B.R. at 349.

The plain and concise language of *Strug-Division* establishes that Debtor's efforts to distinguish it are disingenuous. In analyzing the interplay between and among the individual (a Mr. Giljen), the two debtors, and the two separate entities which in turn owned the real estate parcels, the court stated:

> [D]ebtors have no assets, and they cannot reorganize assets that they do not own. Debtors do not actually own the real property; they merely hold membership interests in the limited liability companies that do own the properties. While Mr. Giljen (as sole member of both Debtors) ultimately controls the real properties, he has decided not to bring the *controlling entities* into these or other bankruptcy proceedings. In fact, Debtors' counsel indicated that Debtors are allowing the foreclosure cases against the entities owning the properties to go forward and will only consider bringing them into bankruptcy when necessary to prevent a sale. Thus, the principal of these debtors has elected to retain his control of the properties, while at this stage in the proceeding *no court jurisdiction lies over the properties* proposed to be dealt with in the pending bankruptcies. Therefore, any plan for reorganization that entails sale of one or both properties is *not legally feasible*. Indeed, in this context, the decision by Giljen *not to give the bankruptcy court jurisdiction over properties* supposedly to be used in the proposed plans is *plain bad faith*.

>   Both plans, which rely on sales of properties not owned by these
>   Debtors, fail for that reason.

35 B.R. at 449 (emphasis added).[3]

Curiously and disturbingly, Debtor in his Response addresses neither this language nor the holding stated therein. Rather, Debtor chooses to provide his own discussion of the court's analysis and basis for its decision. As the above-quoted discussion by the court itself establishes, Debtor gets it wrong.

Wriggle as he might, Debtor cannot escape the applicability of the ruling in *Strug-Division* to the instant matter. What offended the court there is precisely before the Court here, namely, a plan based on revenue produced (hopefully) by assets owned by entities which are not subject to the court's jurisdiction.[4] As the court in *Strug-Division* unmistakably concluded and in language equally applicable to the instant matter, where "no court jurisdiction lies over the properties proposed to be dealt with in the pending bankruptc[y,] . . . any plan for reorganization that entails sale of one or both properties is not legally feasible[, and] the decision . . . not to give the bankruptcy court jurisdiction over properties supposedly to be used in proposed plans is plain bad faith." 375 B.R. at 349.

Moreover, the cases cited by Debtor to support his proposition that the proposed plans are legally feasible are inapposite. For example, *In re Feneis*, No. 09-60317 (Bankr. D. Minn. Jan 20, 2010), involved a plan of reorganization wherein a debtor-husband sought to borrow money

---

[3] Apart from its discussion of the facts and applicable case law, this is a full and complete quotation of the *Strug-Division* court's analysis and holding on the bad faith issue. Nothing is omitted or added. Nothing is paraphrased or glossed. And nothing is spun.

[4] These companies are not subject to the jurisdiction of this court and three of them are owned, in part, by a third-party non-debtor. A third party non-debtor owns an indirect interest in three of the entities of which Debtor intends to use to fund a plan reorganization: 676 Hotel, LLC; 331 Second Avenue, LLC; and 9800 Bren Property, LLC. (*See* Docket No. 38 at Attachment SOFA 18a/b; *see also* Docket No. 115, Affidavit of Megan Kennedy, Ex. B).

N:\PL\80350\80350-022\1207008.DOC

from his non-debtor wife. The holding of *Feneis* is twice removed from the facts of this case, and not applicable here. First, the court approved the plan on the condition that the non-debtor wife sign an agreement wherein she consented to the estate borrowing against the life insurance policy and agreed to loan the estate funds herself. Second, the loan in *Feneis* involved *real money*, and the creditors were not forced to rely on underwater entities hopefully somehow becoming profitable over time.

Debtor's remaining cases on this point exemplify Debtor's willingness to cut snippets of law in an effort to paste together an argument. (Response, ¶ 55). The partial quotation to dicta in *In re Hernandez*, 287 B.R. 795 (Bankr. D. Ariz. 2002), is particularly disturbing. The full sentence reads: "For example, individual Chapter 11 debtors routinely propose plans which are funded from non-estate assets, such as the income derived from services the debtor performs post-petition." *Id.* at 807 (citing § 541(a)(6)). As Debtor is aware, prior to the addition of § 1115 in 2005, the estate assets in an individual chapter 11 case did not include the debtor's post-petition income. Debtor also quotes *Greenblatt v. Richard Potasky Jeweler, Inc. (In re Richard Potasky Jeweler, Inc.)*, 222 B.R. 816, 826 n.17 (S.D. Ohio 1998), but that court was referring to the "unusual circumstances" in which a bankruptcy court may grant a permanent injunction to relieve third party non-debtors from liability. The unpublished opinion in *In re Ball* is not a plan confirmation order as Debtor describes, but rather an order denying the debtor's motion for discharge because the plan was not fully administered. *In re Ball*, No. 06-1002, 2008 WL 2223865, at *1 (Bankr. N.D.W.Va. May 23, 2008). The "non-estate assets" referenced in *In re Hernandez* and *In re Ball*[5] did not include assets belonging to third parties not subject to the

---

[5] The "non-estate assets" are not described in the opinion. An examination of the court's docket also does not reveal the extent of the "non-estate assets" used to fund the plan, but it appears that the court may have been referring to

Continued on following page

- 9 -

N:\PL\80350\80350-022\1207008.DOC

bankruptcy court's jurisdiction, and none of these cases address *Strug-Division* or the circumstances present in this case.

## CONCLUSION

The time is now for this Court to step in, take charge, and end this case for the benefit of all creditors.

Dated: February 16, 2011    Respectfully submitted,

By: /s/ Megan M. Kennedy
Paul L. Ratelle (#127632)
Megan M. Kennedy (#389359)
Jeffrey W. Jones (#311418)
FABYANSKE, WESTRA & HART, P.A.
800 LaSalle Avenue
Suite 1900
Minneapolis, Minnesota 55402
(612) 338-0115

Alexander Terras
Timothy S. Harris
Aaron B. Chapin (#386606)
Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606-7507
312.207.1000
Fax 312.207.6400

**ATTORNEYS FOR GENERAL ELECTRIC CAPITAL CORPORATION AND GECPAC INVESTMENT II, INC.**

---

Continued from previous page
the portion of real property owned by the debtor's wife or the debtor's post-petition income. *See* Debtor's Plan of Reorganization, filed Nov. 6, 2007 in *In re Ball*, No. 06-01002, Docket No. 257 (Bankr. N.D.W.Va.).