# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **In re:** | **Chapter 11 Bankruptcy** |
| **Gerald Trooien,** | **Case No. 10-37695** |
| **Debtor.** | |

## DISCLOSURE STATEMENT IN SUPPORT OF
## DEBTOR'S PLAN OF LIQUIDATION
## DATED MARCH 21, 2011

> THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN
> IS 5:00 P.M. CENTRAL TIME ON _____, 2011
> UNLESS EXTENDED BY ORDER OF THE UNITED STATED
> BANKRUPTCY COURT FOR THE DISTRICT OF MINNESOTA

THIS DISCLOSURE STATEMENT, THE DEBTOR'S PLAN OF LIQUIDATION DATED MARCH 21, 2011, THE ACCOMPANYING BALLOTS, AND THE RELATED MATERIALS ARE BEING FURNISHED BY THE DEBTOR, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE SOLICITATION BY THE DEBTOR OF VOTES TO ACCEPT THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. SEE ARTICLE XI OF THE PLAN. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF ANY SECURITIES THAT MAY BE DEEMED TO HAVE BEEN ISSUED PURSUANT TO THE

PLAN OR OF THIS DISCLOSURE STATEMENT, OR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE WHERE SUCH OFFER OR SALE IS NOT PERMITTED.

TO THE EXTENT ANY TREATMENT UNDER THE PLAN IS DEEMED TO CONSTITUTE THE ISSUANCE OF A SECURITY, NONE OF SUCH SECURITIES WILL HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT, OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS, AND SUCH SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE SECURITIES ACT AND EQUIVALENT STATE LAWS OR SECTION 1145 OF THE BANKRUPTCY CODE.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR AND IS BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF OR OTHER DATE AS NOTED, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE AND THE DEBTOR UNDERTAKES NO DUTY TO UPDATE THE INFORMATION.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTOR, HIS BUSINESS OPERATIONS, THE VALUE OF HIS ASSETS OR THE VALUES OF ANY INTERESTS DESCRIBED TO BE ISSUED OR BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN OR THE

APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND OTHER PLAN DOCUMENTS. ALL HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLAN, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE DETERMINATION OF CLAIMS, DISTRIBUTIONS ON CLAIMS, AND LIQUIDATION OF THE ASSETS OF THE DEBTOR. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, NOR CAN THE IMPACT OF ANY SUCH FACTORS BE ASSESSED.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN AND THE TRANSACTIONS DESCRIBED.

TABLE OF CONTENTS

I.     INTRODUCTION. ...................................................................................................1
      A.      Summary of the Plan....................................................................................1
      B.      Voting Procedures.........................................................................................2
      C.      Brief Explanation of Chapter 11. ................................................................2

II.     DESCRIPTION OF DEBTOR'S BUSINESSES PRIOR TO BANKRUPTCY. ...............3
      A.      Nature and History of the Debtor's Business. ...........................................3
      B.      Events Leading to Decision to File under Chapter 11. ..............................5

III.    EVENTS DURING CHAPTER 11 CASE. ..............................................................5
      A.      Appointment of Committee. ........................................................................5
      B.      Significant Motions......................................................................................6
      C.      Description of Preference Litigation............................................................8
      D.      Analysis of Assets and Plan Preparation ...................................................9

IV.    POTENTIAL POSTPETITION LITIGATION...........................................................10
      A.      Avoidance Actions.....................................................................................10
      B.      Claim Objections. ......................................................................................10

V.     SUMMARY OF THE PLAN. ...............................................................................11
      A.      Overview of Classification and Treatment of Claims................................11
      B.      Detailed Description of Classes and Treatment........................................12
      C.      Appointment of Liquidating Agent and Oversight Committee. ..................15
      D.      Treatment of Debtor's and Estate's Assets...............................................16
      E.      Claims Belonging to the Estate..................................................................23
      F.      Executory Contracts and Unexpired Leases .............................................24
      G.      Distributions and Claims Administration ..................................................24
      H.      Effect of Confirmation................................................................................26

VI.    PROOFS OF CLAIM AND ADMINISTRATIVE EXPENSE CLAIMS........................27

VII.    TAX CONSEQUENCES OF THE PLAN. ...............................................................27
      A.      Federal Income Tax Consequences to the Bankruptcy Estate and the
            Debtor. .......................................................................................................27
      B.      Federal Income Tax Consequences to Holders of General Unsecured
            Claims. .......................................................................................................31
      C.      Withholding and Reporting.........................................................................31

VIII.   ALTERNATIVES TO THE PLAN. .......................................................................32

IX.    ACCEPTANCE AND CONFIRMATION OF THE PLAN.............................................32
      A.     General Confirmation Requirements. ....................................................32
      B.     Best Interests Test...........................................................................33
      C.     Financial Feasibility Test. ...................................................................34

X.     CONCLUSION.............................................................................................1

EXHIBITS

A.    Plan Definitions
B.    Ownership of Entities
C.    Status of Entities
D.    Property Tax Appeal Status
E.    Debt, Basis, and Tax Attributes
F.    Hypothetical Distributions under Chapter 7 and the Plan

I.      INTRODUCTION.

The Debtor's Plan of Liquidation ("Plan") which is proposed by Gerald Trooien, sets forth, among other things, the proposed treatment of claims and interests in accordance with the Bankruptcy Code.

This Disclosure Statement in Support of Debtor's Plan of Liquidation ("Disclosure Statement") is intended to explain the Plan and provide adequate information to allow an informed judgment regarding the Plan.  A copy of the Plan is included with this Disclosure Statement.  If the Plan and this Disclosure Statement are not consistent, the terms of the Plan control.  The Plan uses a number of defined terms.  The same defined terms apply to the Disclosure Statement.  A list of the defined terms is attached as Exhibit A.

A.      Summary of the Plan.

The Plan provides the mechanisms for determining claims, gathering and liquidating assets, and distributing assets to creditors.  The Plan provides for full payment of Allowed administrative expense claims and leaves unaltered the rights of holders of secured claims with respect to their collateral.

Essentially the Plan provides that the assets that would have been available to creditors in a chapter 7 case will be liquidated for distribution to creditors.  In addition, the Plan provides for abandonment of interests in operating and non-operating Entities in return for payment by the Debtor which will increase the distribution to creditors.  Holders of claims of under $1,000 or who reduce their claims to that amount will receive full payment.  Claims held by related Entities will be subordinated to all other claims.  Holders of general unsecured claim will receive a pro rata distribution form the liquidation proceeds.

As of the Effective Date, the Plan provides for a Liquidating Agent and Oversight Committee selected by the committee of unsecured creditors to carry out the Plan provisions.  The Liquidating Agent will have the power and responsibility to analyze claims, gather and liquidate assets, and distribute proceeds to the unsecured creditors.  The Plan provides that such distributions may be made at the Liquidating Agent's discretion.  The Debtor estimates that holders of Allowed general unsecured claims will receive between a 2.20 and 3.95% recovery on their claims, depending on the total amount of general unsecured claims.

As described in detail below, the Plan provides for various dispositions of assets.  Some assets are exempt from the bankruptcy estate, some will be abandoned to the Debtor in exchange for payments, and some are retained by the Post-Confirmation Estate for administration by the Liquidating Agent and distribution to the unsecured creditors.  In some cases, the abandonment or retention of assets is a result of the tax consequences of such actions.

The Plan provides that the Liquidating Agent may object to claims or pursue Avoidance Actions against creditors or parties in interest, regardless of whether they have voted for the plan.  The Plan further provides for an immediate discharge of indebtedness for the Debtor on the Confirmation Date.

B.      Voting Procedures.

Ballots to be used for voting to accept or reject the Plan are enclosed with all copies of this Disclosure Statement mailed to all classes entitled to vote.

Please fill out, sign and mail the enclosed ballot to the following address:

> Clerk of Court
> United States Bankruptcy Court
> U.S. Courthouse
> 300 South Fourth Street
> Minneapolis, MN 55415

The deadline for delivery of ballots is _____, 2011.

DEBTOR URGES CREDITORS AND INTEREST HOLDERS TO VOTE IN FAVOR OF THE PLAN.  DEBTOR BELIEVES THAT THE PLAN OFFERS THE BEST POSSIBLE RECOVERY FOR CREDITORS.  QUESTIONS CONCERNING THE PLAN SHOULD BE ADDRESSED IN WRITING OR BY TELEPHONE TO DEBTOR'S COUNSEL.

**[Recommendation of committee]**

C.      Brief Explanation of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 is also available to individuals whose income and indebtedness exceed certain limits. Upon the filing of a petition for reorganization under Chapter 11, Section 362 of the Bankruptcy Code generally provides for an automatic stay of all attempts to collect claims or enforce liens that arose prior to the commencement of the bankruptcy case or that otherwise interfere with a debtor's property or business.

The principal objective of a Chapter 11 reorganization is the confirmation of a plan of reorganization or liquidation.  The plan sets forth the means for satisfying the claims of creditors of the debtor.  The plan and a disclosure statement that contains information necessary to allow creditors to evaluate the plan are sent to creditors whose claims or interests are impaired, who then vote to accept or reject the plan.

A class of claims is entitled to vote to accept or reject a plan if that class is "impaired" by the plan.  A class of claims is impaired unless the plan cures any defaults that may exist with respect to the claims and leaves unaltered the legal, equitable, and contractual rights to which the claim entitles the holder of the claim.

A plan may be confirmed under Section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each such class has voted to accept the plan. Votes will be counted only with respect to claims:  (1) that are listed on the Debtor's Schedules other than as disputed, contingent or unliquidated; or (2) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim.  However, any vote by a

holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order from the Court allowing such a claim for voting purposes. A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to accept the plan.

If an impaired class votes to reject the plan, the proponent of the plan can attempt to "cram down" the plan by confirming it under Section 1129(b) of the Bankruptcy Code. A plan proponent may cram down a plan upon a rejecting class only if another impaired class has voted to accept the plan, and the plan does not discriminate unfairly and is fair and equitable with respect to each impaired class that has not voted to accept the plan. Case law is divided on the question of whether individual chapter 11 debtors may retain any estate property if they cram down the plan on unsecured creditors.

Voting on the plan by each holder of a claim in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of such a claim should vote on the enclosed ballot either to accept of reject the Plan. Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

Section 1129(a) of the Bankruptcy Code establishes the conditions for the confirmation of a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process. Among the conditions for plan confirmation is that either each holder of a claim or interest must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

If the Plan is confirmed by the Court, its terms are binding on the Debtor, all creditors, and other parties in interest, regardless of whether they have accepted the Plan. For individual Chapter 11 debtors, debts are discharged either at the completion of the payments or at an earlier date. Here the Plan provides that the Debtor will receive his disclosure at the time of the entry of the Confirmation Order.

II.     DESCRIPTION OF DEBTOR'S BUSINESSES PRIOR TO BANKRUPTCY.

A.     Nature and History of the Debtor's Business.

In the six years prior to the Filing Date, the Debtor held ownership interests in more than one hundred separate Entities. In the two years prior to the Filing Date, approximately 39 Entities actively operated or owned assets, and the remainder were either holding companies, had been dissolved, or were inactive. The active Entities represented six types of operating activities: vacant land and development; commercial building ownership and leasing; building management and maintenance; hotel, restaurant, and parking services; aircraft leasing, and technology.

Commercial Building Ownership and Leasing. The core of the Debtor's business activity has been owning and leasing multi-tenant commercial office space. Significant properties include the TriTech building in downtown Minneapolis, the Roseville Corporate Center in

Roseville, the Portech Building in Minneapolis, the Gateway South Office Building and Minneapolis Gift Mart in Minnetonka, the 1275 Red Fox Road building in Arden Hills, the Comcast Building and the former US Bank building in St. Paul.

<u>Building Management and Maintenance</u>. The Debtor owns JLT Group, Inc. and Lake Region Building Maintenance, Inc. ("Lake Region"), which provide the building management and maintenance services for the commercial buildings that his other Entities own and lease. Whereas the commercial building Entities own real property and have no employees, JLT Group and Lake Region own no real property and employ the accounting, sales, marketing, and maintenance personnel who support the leasing and upkeep of all the commercial property Entities.

<u>Vacant Land and Development</u>. Several Debtor-owned Entities held vacant land for development. Much of this property is located in the Minnesota towns of Woodbury, St. Paul, and Fridley. The primary lender to the Debtor on vacant land is Dougherty Funding, LLC.

<u>Hotel, Restaurant, Team Parking</u>. Some of the Entities own the Sheraton St. Paul Woodbury Hotel in Woodbury and Aperitif Restaurant located adjacent to the hotel. The hotel is operated by third-party management company that specializes in hospitality management. The restaurant has closed. The Debtor also owns Team Parking, LLC, an off-airport parking provider and shuttle service for passengers departing from the Minneapolis-St. Paul International Airport.

<u>Aircraft Leasing</u>. The Debtor owns a number of Entities that purchased helicopters and jet and turbo-prop aircraft to lease to companies that intended to operate the aircraft for business uses. With one exception, these leasing companies have all defaulted on their leases with the Debtor-owned companies, and the aircraft have been repossessed and by their lenders, with some having been sold and others awaiting sale. As of the Filing Date, none of the aircraft leasing companies were solvent or and only two were operating.

<u>Technology</u>. The Debtor invested in several technology ventures, including notably Nazca Solutions, Inc. ("Nazca") and Sproqit Technologies, Inc. ("Sproqit"). The Debtor loaned money to and owned fifty percent of the equity of Nazca, which acquires and combines real estate data to support title and loan underwriting, quality control, and process automation for the settlement services and default services industries. After the Filing Date, Nazca became subject to an asset purchase agreement that closed shortly after the Filing Date and provided approximately $1,446,000 to the estate and a $1,000,000 receivable in the form of a holdback to secure certain standard representations and warranties of the Debtor as seller.

Sproqit was created in 2000 to develop products for remote application users to access desktop applications across multiple devices and network connections while maintaining desktop functionality and usability. In 2009, Sproqit's senior management was removed and the Debtor funded continued development up to the Filing Date, though the Sproqit assets have not yet yielded a marketable product.

B.      Events Leading to Decision to File under Chapter 11.

The Debtor's decision to file bankruptcy was based both on the general conditions of his Entities and a specific creditor action.  As a general matter, the Debtor's real estate activities were suffering from the same market forces acting across the national commercial real estate market since 2008.  The underlying values of raw land had plummeted.  The demand for commercial office space was low.  Tenants were requesting and receiving rent reductions and additional tenant improvement allowances.  Restaurant patronage was declining in sectors other than fast food.  Private aircraft leasing became a public relations liability to both corporations and wealthy individuals, who left the marketplace.

In and before 2009, the lessors of aircraft from the Debtor's aircraft leasing Entities ceased making lease payments.  Secured lenders to the aircraft leasing Entities (the "Aircraft Lenders") began collection efforts, including filing lawsuits in state and Federal courts.  The Debtor's aggregate liability under personal guaranties to the Aircraft Lenders was approximately $40 million after allowance for the projected proceeds from the sale of the aircraft securing the loans.  Around the same time, US Bank, the sole tenant of Shepard Road Acquisition Company, LLC ("Shepard Road") one of the Debtor's largest projects, announced that it would not renew its lease in 2010, and subsequently moved out of the building.  Shepard Road was unable to locate a new tenant and the Debtor lost a significant source of income that had supported other Entities such as the raw land holders and building owners with low occupancy.  Aperitif Restaurant opened its doors in early 2010 but was unable to generate sufficient income to cover its construction costs, debt service, and operating costs.

In April 2010, the Debtor approached the three largest Aircraft Lenders to attempt a workout that depended on the unanimous acceptance of the Aircraft Lenders, which the Debtor was unable to obtain.  On July 28, 2010, GE obtained a "charging order" that granted it a lien on the Debtor's ownership interests in 29 of the Entities, including all of the ownership interests for which the Debtor will make payments to the Post-Confirmation Estate under the Plan.  After entry of the charging order, two other Airline Lenders indicated that they were considering filing an involuntary bankruptcy against the Debtor in order to take advantage of the Bankruptcy Code's power to undo the GE lien within 90 days of its creation.  However, the Debtor had already decided that he would file this bankruptcy case to avoid the GE lien and preserve the value of the Entities subject to the lien for the benefit of all unsecured creditors.  At that time the Debtor faced personal liabilities on guaranties that even after disposition of collateral will be at least $50,000,000 and may well exceed $100,000,000.


III.    EVENTS DURING CHAPTER 11 CASE.

A.      Appointment of Committee.

On November 23, 2010, the United States Trustee appointed a Committee of Unsecured Creditors ("Committee") consisting of Dougherty Funding, LLC (contact person Jerry Tabolich); Associated Bank, NA (contact person Jiri Mikl); and Wells Fargo Equipment Finance (contact person Joseph Letts).  It is represented by counsel Steven D. DeRuyter, Lara O. Glaesman, and Amanda K. Schlitz of the law firm of Leonard, Street and Deinard, P.A.

B.    Significant Motions.

1.    Enforcement of Stay

On October 28, 2010, General Electric Capital Corp. and GECPAC Investment II, Inc. (together "GE") filed and served a Motion for Miscellaneous Relief, or Alternatively for Relief from the Automatic Stay.  By this motion, GE sought a declaration from the Bankruptcy Court that the automatic stay did not apply to the Entities in which Debtor held ownership interests so that GE could pursue a motion in the United States District Court against those Entities. Alternatively, GE sought relief from the automatic stay.  The Debtor opposed GE's motion.  A hearing was held on November 3, 2010, and on November 4, 2010, the bankruptcy court issued an order ruling that the automatic stay applied to the Entities and barred GE's collection efforts against them.  The hearing on GE's motion for relief from the automatic stay was continued to December 8, 2010.

2.    Relief for the Stay

Following the November 3, 2010 hearing described above, the court permitted the parties to submit further briefs on whether the automatic stay should be lifted to permit GE to pursue relief against the Entities in which Debtor held ownership interests.  A hearing was held on December 8, 2010, and on December 14, 2010, the court temporarily denied GE's motion for relief from the automatic stay, and continued GE's motion to a hearing at a date to be set later by the court.  This motion will be withdrawn as part of a settlement with GE.  See Description of Preference Litigation, p. 8.

3.    Retention of Professionals

On October 25, 2010, the Debtor filed an Application to Employ Chapter 11 Counsel (Fredrikson & Byron, P.A.).  In the Declaration supporting the Application, Fredrikson & Byron disclosed that it represented the numerous Entities in which Debtor held an ownership interest. The U.S. Trustee filed a report and recommendation opposing Debtor's application, on the grounds that the selected counsel had a conflict of interest.  The Debtor and U.S. Trustee submitted further briefing on the issue and a hearing was held on November 18, 2010.  On November 19, 2010, the court issued an order granting the application to employ Fredrikson & Byron as chapter 11 counsel.

On November 5, 2010, the Debtor filed an Application to Employ Manchester Companies, Inc. ("Manchester Companies") as Financial Consultant.  On November 17, 2010, the Debtor filed an Application to Employ G. Robert McLean as Tax and Accounting Advisor. The U.S. Trustee filed a report and recommendation in favor of both applications.  On November 19, 2010, the court issued orders granting the applications to employ.

4.    Motion for Retention of Separate Attorney for Debtor

On November 22, 2010, the Debtor filed a motion to pay post-petition retainers to Fredrikson & Byron, Manchester Companies, and G. Robert McLean.  On November 24, 2010,

the Debtor filed an amended motion to pay post-petition retainers. In the amended motion, in addition to seeking permission to pay the three retainers listed above, the Debtor requested permission to pay a post-petition retainer to Spence, Ricke, Sweeney, and Gernes, P.A., ("SRSG"), which the Debtor proposed to hire as counsel to him individually, and not in his capacity as debtor-in-posession. On December 2, 2010, the court granted the motion as to the retainers for Fredrikson & Byron, Manchester Companies, and G. Robert McLean. The court continued to December 15, 2010, the hearing on the motion to pay a post-petition retainer to SRSG. The U.S. Trustee and GE filed objections to the motion to pay a post-petition retainer to SRSG. On December 15, 2010, the court denied the Debtor's motion to pay a post-petition retainer to SRSG.

### 5. Motion to Convert or Dismiss

On January 27, 2011, GE filed a motion to convert or dismiss the bankruptcy case. The U.S. Trustee joined the motion, in part because of the Debtor's failure to file certain forms, which have since been filed. Creditor Banc of America Leasing and Capital, LLC, also joined the motion. The Debtor objected to the motion and the Committee joined the Debtor in opposing the motion. A hearing was held on February 17, 2011. Thereafter, on February 22, 2011, the court issued an order continuing the hearing to March 29, 2011. The Debtor expects that the hearing will be continued to a later date. As part of the settlement described below in Section C, GE agreed that it will file no further pleadings and will present no further arguments in relation to the motion.

### 6. Professional Fees

On January 18, 2011, the Debtor filed applications for compensation for Fredrikson & Byron, Manchester Companies, and G. Robert McLean. GE objected to the fee applications for Fredrikson & Byron and Manchester Companies. A hearing was held on February 17, 2011. On February 22, 2011, the court issued an order in which the hearing on the fee applications was continued to March 29, 2011, and which the Debtor expects will be further continued until the hearing on Plan confirmation. As part of the settlement with GE, it agreed that it will file no further pleadings and will present no further arguments in relation thereto.

### 7. Extension of Exclusivity Period

Section 1121(d) of the Bankruptcy Code for Debtor provides time periods within which a Debtor has the exclusive right to file and obtain acceptance of a plan of reorganization. GE objected to Debtor's motion. A hearing was held on February 17, 2011. On February 22, 2011, the court issued an order in which the court granted Debtor's motion. Specifically, the court ordered that the exclusivity period was extended so that it expired at the conclusion of the tenth day after the court rules on the adversary proceeding against GE, either by summary judgment or by trial, but in any event no later than April 4, 2011, and the exclusivity period in which to obtain confirmation of the plan expires 60 days thereafter. The Debtor expects the deadline for plan confirmation to be extended slightly in light of the recent Rule changes for notice periods.

C.     Description of Preference Litigation

Prior to the Filing Date, in May 2009, General Electric Capital Corporation and GECPAC Investment II, Inc. (together "GE") commenced an action in United States District Court for the District of Minnesota, Court File No. 09-1200 (JNE/AJB) (the "District Court Case") against three parties:  (1) JLT Aircraft Holding Company, LLC; (2) Aircraft No. 1074 Company, LLC; and (3) Gerald L. Trooien ("Trooien").  GE asserted claims to collect amounts it contended were owed by JLT Aircraft Holding Company, LLC, and Aircraft No. 1074 Company, LLC, and guaranteed by Trooien.

On December 18, 2009, the court in the District Court Case granted GE summary judgment on all claims against all three defendants.  Judgment in the amount of approximately $18 million plus interest was entered against the three defendants, jointly and severally.  At that time, the judgment against Trooien was unsecured.

In May 2010, GE sought to place a lien on Trooien's ownership interests in certain of the Entities (which were not parties to the Federal case).  To that end, GE brought a motion in the Federal Case for a charging order pursuant to Minn. Stat. §§ 321.0703(e), 322B.32; 323A.0504(e).

On July 28, 2010, the United States District Court for the District of Minnesota entered an Order (the "Charging Order") in favor of GE, whereby GE was granted a lien on Plaintiff's ownership interests in 29 separate Entities, each of which is listed in the Charging Order.  On September 2, 2010, in the District Court Case, the court entered a second order (the "Second Order") requiring the 29 Entities to pay over to GE any amounts that may, from time to time, become distributable to Debtor on account of his ownership interest, until such time as GE's judgment was satisfied in full.  GE subsequently brought a motion in the District Court Case alleging that certain of the 29 Entities violated the Charging Order and the Second Order.  The Debtor and the Entities denied those allegations.

Debtor filed this chapter 11 case on October 25, 20101.  On November 1, 2010, Debtor commenced an adversary proceeding, Adv. No. 10-03227 (the "Adversary Action") against GE in which Debtor sought to avoid the liens held by GE on his ownership interests in the various Entities.  In the Adversary Action, the Debtor contended that the liens on Debtor's ownership interests constituted transfers of Debtor's interests in the Entities to or for the benefit of GE for an antecedent debt, that the imposition of the liens occurred on or within ninety (90) days before the Filing Date, that the liens were imposed when Debtor was insolvent and that holding the liens enabled GE to receive more than it would receive if (i) the Debtor's case was under Chapter 7 of the Bankruptcy Code; (ii) the Transfers had not been made; and (iii) each of the Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.  As a result, Debtor asserted a claim under 11 U.S.C. § 547(b) to avoid the liens.

GE answered the Debtor's complaint in the Adversary Action, denying the Debtor's entitlement to the relief sought.  The parties engaged in discovery.  On February 22, 2011, the Debtor filed a motion for summary judgment.  On March 4, 2011, GE filed its response to the motion for summary judgment.  On March 8, 2011, the parties participated in a mediation with United States Bankruptcy Judge Dennis D. O'Brien.  The mediation was unsuccessful, but

dialogue between the parties continued after the mediation. On March 9, 2011, the Bankruptcy Court heard oral argument on Debtor's motion for summary judgment. The Court was prepared to rule on the summary judgment motion but has not done so because of the settlement reached by the parties.

On March 10, 2011, the Debtor and GE reached an agreement on the terms of a settlement of the Adversary Action. In summary, the Settlement Agreement provides that the Debtor's estate will pay to GE the sum of $87,500 within three days after the Settlement Agreement is approved by the Bankruptcy Court, which approval was granted on March 21, 2011. Thus, the payment will be made on March 24, 2011.

In exchange for this payment, GE agreed that the liens created by the Charging Order and all claims created by the Charging Order, including but not limited to any claims arising from or described in the motion, are and shall be treated as avoidable preferences and subject to sections 547, 550 and 551 of the United States Bankruptcy Code.

In addition, GE agreed to withdraw its lift stay motion, which was pending in the bankruptcy case. GE also agreed to withdraw its Contempt Motion in the District Court Case without prejudice. With regard to GE's pending motion to convert or dismiss the above-referenced bankruptcy case, scheduled for hearing on March 29, 2011, GE agreed that it will file no further pleadings and will present no further arguments in relation thereto.

GE has also agreed that it will file no other motions, objections, or other pleadings in the bankruptcy case and shall not object to any disclosure statement or proposed plan, and shall not object to confirmation.

GE retained its claim in the bankruptcy case and shall be entitled to vote with respect to any plan, and to receive and retain any dividends or distributions attributable to its claim, which as a result of disposition of collateral is approximately $10 million.

D.      Analysis of Assets and Plan Preparation

The Debtor and Manchester performed an exhaustive analysis of the Entities the Debtor owns to determine which could produce value in the future. Manchester and the Debtor analyzed the books and records of operating Entities, developed short-term cash flow projections, and identified the operating Entities' immediate cash needs to determine whether immediate action might be required to preserve their value for the estate. These services formed the basis for a motion to use estate property designed to make available funds to cover potential short falls. Eventually the Debtor decided to withdraw the motion. During the case the assets of the Entities have been held separate. The Debtor and Manchester then worked with the Debtor on strategies to minimize the actual cash needs, which involved  additional reconciliation of the books and records. Manchester established procedures and schedules to monitor cash receipts, cash disbursements, cash in bank reconciliations and comparisons of actual to budget monthly operating statements for each Debtor-controlled Entity. In furtherance of a plan proposal, Manchester prepared an analysis and cash flow projection for each of the operating Entities for presentation to the Committee. The presentation included analysis of cash flow positive Entities,

cash flow negative Entities, Entities controlled by lenders, and management and maintenance Entities. Manchester prepared and presented actual cash flow summaries, bank balances, and cash flow projections for each Entity which had operations and prospects for success through January 2011. The Debtor subsequently used the report to determine the payments to the Post-Confirmation Estate in exchange for the abandonment of ownership interests described in detail below.


IV.    POTENTIAL POSTPETITION LITIGATION.

    A.    Avoidance Actions.

    Under section 547 of the Bankruptcy Code, certain transfers made by a debtor to creditors within 90 days (or, in some cases, one year) of the Filing Date may be recovered as preferential payments. Such claims are preserved by the Debtor under the Plan. Section 548 of the Bankruptcy Code gives the Debtor power to avoid fraudulent transfers. These powers and others are referred to as "Avoidance Claims." Except as discussed above, Debtor does not believe any Avoidance Claims exist; however, the Liquidating Agent shall retain the sole discretion as to whether to pursue such claims and whether to settle, dismiss, compromise, or withdraw such claims once commenced. The net proceeds of such claims shall be retained by the Liquidating Trust for use in making payments under the Plan.

    As set forth in Question 3b of the Statement of Financial Affairs filed with the Schedules, the Debtor has identified the following aggregate transfers in excess of $5,850 made in the 90 days prior to the Filing Date: American Express $10,857.03; Bank of America $11,929.83; First Horizon $29,574.96; and Thomas Law, P.A. $12,819.91. In addition, the Debtor made certain transfers to JLT Group, Inc. and Lake Region in the year prior to the Filing Date which are set forth on Attachment SOFA 3c to the Statement of Financial Affairs filed with the Schedules. The Debtor disclosed all transfers outside the ordinary course of his business and financial affairs in the Schedules.

    The Debtor has not reviewed his books and records to determine whether these are avoidable transfers and the Liquidating Agent will have the ability under the plan to consider whether they are preferential, whether there are defenses, and whether the costs of pursuing claims justifies doing so. In addition, the Liquidating Agent will have the power to analyze the existence of additional Avoidance Claims, taking into account the costs of pursuing such claims or the defenses that may be asserted by the transferee, including that the payments were made in the ordinary course of business or are offset by the subsequent provision of new value. All such claims, if they are pursued, will be pursued against persons or entities, such as unsecured creditors, who may otherwise be entitled to vote for or against then Plan. The Liquidating Agent may pursue such claims against a particular holder even if such holder votes for the Plan.

    B.    Claim Objections.

    The Debtor, the Liquidating Agent and other parties in interest may object to any scheduled or filed claims that are incorrect, but presumably will compare filed claims to those scheduled and attempt to resolve any discrepancies before commencing the objection process.

The Debtor anticipates that objections may be filed with respect to the claim of Northern Freight Brokers, Inc. and any other claims filed by counterparties to litigation pending as of the Filing Date. The deadline for objections to claims is set by the Plan, but the Court may by order set a different deadline.

V.     SUMMARY OF THE PLAN.

   *The below summary is provided for the convenience of holders of Claims. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The summary of the Plan in this Disclosure Statement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the full text of the Plan, including the definitions of terms contained in the Plan. All holders of claims are encouraged to review the full text of the Plan, and to read carefully this entire Disclosure Statement, including all exhibits hereto.*

   A.     Overview of Classification and Treatment of Claims

   Following the requirements of the Bankruptcy Code, all claims are placed in categories. Most are placed into separate classes, others are unclassified. These categories are described in detail in the Plan and later in this paragraph.

   The Plan proposes certain different "treatment" for all the claims or interests in the unclassified categories and the classes. Following is a chart of the estimated amounts in each unclassified category and class along with the proposed treatment for each.

| Class No. | Description of the Class | Estimated Amount of Claims | Proposed Treatment | May Vote |
|---|---|---|---|---|
| N/A | Administrative Expenses | unknown | Paid in full on the Effective Date or as due | No |
| N/A | Priority Claims | None | N/A | No |
| 1-A | Secured Claim – First Horizon Home Loans (on homestead) | $1,462,754.52 | Paid in full according to its terms | No |
| 1-B | Secured Claim – Banc of America Leasing and Capital (on homestead) | $0.00 | Lien shall be terminated as a lien on exempt property and the claim shall be unsecured claim. | No |
| 1-C | Secured Claim – Associated Bank, N.A. (on homestead) | $0.00 | Lien shall be terminated as a lien on exempt property and the claim shall be unsecured claim. | No |
| 1-D | Secured Claim – GECPAC Investment II, Inc. and General Electric Capital Corp. (on homestead) | $0.00 | Lien shall be terminated as a lien on exempt property and the claim shall be unsecured claim. | No |
| 1-E | Secured Claim – Ford Motor Credit (on motor vehicle) | $44,995.87 | Paid in full according to its terms | No |

| Class No. | Description of the Class | Estimated Amount of Claims | Proposed Treatment | May Vote |
|---|---|---|---|---|
| 1-F | Secured Claim – Bank of America (on cabin) | $564,474.86 | Creditor shall be permitted to exercise its remedies. | No |
| 1-G | Secured Claims – Northern Freight Brokers (on cabin) | $0.00 | Creditor shall be permitted to exercise its remedies. | No |
| 1-H | Secured Claim – Banc of America Leasing and Capital, LLC (on cabin) | $185,525.15 | Creditor shall be permitted to exercise its remedies. Balance of claim shall be an unsecured claim. | No |
| 1-I | Secured Claim – Bank of America (membership interest of JLT Mobil Building LP) | $0.00 | Claim shall be unimpaired and lien may be enforced according to its terms. | No |
| 1-J | Secured Claim – Private Bank (letter of credit on West Biel project) | $175,000 | Claim shall be unimpaired and lien may be enforced according to its terms. | No |
| 2-A | Administrative Convenience Class | $11,000.00 | Paid in full on the Effective Date | No |
| 2-B | General Unsecured Claims | $90,000,000.00 | Could be between $50,000,000 and $120,000,000. Will be paid pro-rata share of funds be distributed by a Liquidating Agent from the Post-Confirmation Estate. | Yes |
| 2-C | Subordinated Unsecured Claims | $10,915,022.70 | Paid after payment in full to holders of claims in Class 2-B | Yes |

The holders of Claims in classes that are classified as "impaired" are entitled to vote on the Plan. The classes that are entitled to vote under the Plan are Classes 2-B and 2-C.

B.     Detailed Description of Classes and Treatment

Following is a description of the classes and the treatment. This section is taken from the Plan. In case of inconsistency, the Plan controls. This section may have some additional information about the classes.

<u>Category 1--Secured Claims</u>

<u>Class 1-A - Secured Claim – First Horizon Home Loans</u>. This class consists of the Allowed secured claim of First Horizon Home Loans ("First Horizon") in the amount of approximately $1,462,754.52 as of the Filing Date. First Horizon's claim is fully secured by a mortgage in the Homestead Property. On and after the Effective Date, First Horizon will receive the following treatment:

The holder of this Allowed claim shall receive monthly payments, as provided under the contract, until the Allowed claim is paid in full, according to the terms of the loan documents. Upon payment in full of its Allowed claim, First Horizon's lien on and security interest in the homestead shall be discharged and released. First Horizon and Debtor shall execute such documents and take such actions as are necessary to evidence the release of First Horizon's lien. Debtor's obligations to First Horizon under the terms of the prepetition loan documents with First Horizon shall be unimpaired.

Class 1-B - Secured Claim – Banc of America Leasing and Capital, LLC. This class consists of the secured portion of the claim of Banc of America Leasing and Capital, LLC ("Banc of America"). The claim may be asserted to be secured by a judgment lien on the Debtor's Homestead Property. Because this property is exempt, the secured claim is $0. On and after the Effective Date, Banc of America Leasing and Capital, LLC will receive the following treatment:

To the extent that sufficient value exists in the Homestead Property in excess of the Class 1-A Claim and the Debtor's homestead exemption, the lien shall remain in effect. The balance of this claim shall be treated as a General Unsecured Claim in Class 2-B.

Class 1-C - Secured Claim – Associated Bank, N.A. This class consists of the secured claim of Associated Bank, N.A. ("Associated"). The claim may be asserted to be secured by a judgment lien on the Debtor's Homestead Property. Because this property is exempt, the secured claim is $0. On and after the Effective Date, Associated Bank, N.A. will receive the following treatment:

The claim shall be avoided as a lien on exempt property. The claim of Associated shall be treated as a General Unsecured Claim in Class 2-B.

Class 1-D - Secured Claim – GECPAC Investment II, Inc. and General Electric Capital Corp. This class consists of the secured portion of the claim of GECPAC Investment II, Inc. and General Electric Capital Corp. ("GE"). The claim is secured by a judgment on the Debtor's Homestead Property. Therefore, the secured claim is $0. On and after the Effective Date, GE will receive the following treatment:

The claim shall be avoided as a lien on exempt property. The claim of GE shall be treated as a General Unsecured Claim in Class 2-B.

Class 1-E - Secured Claim – Ford Motor Credit. This class consists of the Allowed secured claim of Ford Motor Credit secured by a lien on a 2010 Ford Expedition automobile in the approximate amount of $44,995.87. On and after the Effective Date, Ford Motor Credit will receive the following treatment:

The holder of this Allowed claim shall receive monthly payments, as provided under the applicable loan documents, until the Allowed claim is paid in full. Upon payment in full of its Allowed claim, Ford Motor Credit's lien on and security interest in the automobile shall be

discharged and released. Ford Motor Credit and Debtor shall execute such documents and take such actions as are necessary to evidence the release of Ford Motor Credit's lien. Debtor's obligations to Ford Motor Credit under the terms of the prepetition contract with Ford Motor Credit shall be unimpaired.

Class 1-F - Secured Claim – Bank of America. This class consists of the Allowed secured claim of Bank of America in the amount of approximately $564,474.86 as of the Filing Date. Bank of America's claim is fully secured by a first priority mortgage in the Debtor's Cabin Property. On and after the Effective Date, Bank of America will receive the following treatment:

The holder of this Allowed claim shall be permitted to exercise its remedies under the applicable loan documents. This claim is unimpaired.

Class 1-G - Secured Claim – Northern Freight Brokers. This class consists of a disputed mechanic's liens on the Cabin Property in favor of Northern Freight Brokers, Inc., d/b/a Gull Lake Construction ("NFB") on account of materials and labor for construction of a second-story addition. The amount of the mechanic's lien is $67,101.65. On and after the Effective Date, NFB will receive the following treatment:

The holder of this claim shall be entitled to exercise its remedies, subject to the right of the Debtor or the Liquidating Agent to assert claims against NFB that may invalidate the lien. The balance of any amount due the holder shall be treated as a General Unsecured Claim in Class 2-B.

Class 1-H - Secured Claim – Banc of America Leasing and Capital, LLC. This class consists of the secured claim of Banc of America Leasing and Capital, LLC. The claim is secured by a judgment lien on the Debtor's Cabin Property. The estimated value of the judgment lien is $185,525.75, based on a total value of the Cabin Properties of $750,000. On and after the Effective Date, Banc of America Leasing and Capital, LLC will receive the following treatment:

The holder of this claim shall be permitted to exercise its remedies. The balance of amounts due the holder shall be treated as a General Unsecured Claim in Class 2-B.

Class 1-I - Secured Claim – Bank of America. This class consists of the Allowed secured claim of Bank of America in the amount of approximately $18,356,131.33 as of the Filing Date. The claim is secured by a pledge of membership interests in JLT Mobil Building LP. On and after the Effective Date, Bank of America will receive the following treatment:

The Allowed claim shall be unimpaired and the holder may enforce its pledge according to its terms.

Class 1-J - Secured Claim – Private Bank. This class consists of the Allowed secured claim of Private Bank Minnesota in the amount of approximately $175,000 as of the Filing Date. The

claim is secured by a promissory note and assignment of deposit account dated April 25, 2007 and a promissory note and assignment of deposit account dated June 29, 2007, which in turn support two Letters of Credit granted in favor of the City of Woodbury to secure obligations under a certain Commercial Developer's Agreement – Tamarack Hills II Addition.  On and after the Effective Date, Private Bank will receive the following treatment:

The Allowed claim shall be unimpaired and may be enforced according to its terms.


Category 2--Unsecured Claims

Class 2-A - Administrative Convenience Class.  This class consists of all Allowed unsecured claims against Debtor that are (a) in the amount of $1,000 or less, or (b) reduced by the holder of the claim to $1,000 and be treated under this class through an election on the ballot cast on this Plan.  These claims will be paid and satisfied in full by payment to each holder of an Allowed claim in this class of cash equal to one hundred percent (100%) of the Allowed claim on the Effective Date.  Debtor estimates the amount to be paid in the class will be approximately $11,000.


Class 2-B - General Unsecured Claims.  This class consists of all Allowed unsecured claims against the Debtor that (a) are not entitled to priority and (b) are not classified elsewhere in this Plan.  Each Allowed claim in this class will be paid and satisfied in full by payment to each holder of an Allowed claim of its pro-rata share of distributions from the Post-Confirmation Estate.  Debtor estimates Allowed claims in this class will be approximately $90,000,000.  However, the proof of claim period is not yet closed and a large part of the claims in this class will be for deficiency claims on real estate loans where the Debtor is a guarantor, so there is a large range of potential claims.  The total Allowed claims in this class is estimated to be in the range of $50,000,000 to $120,000,000.


Class 2-C – Subordinated Unsecured Claims Class.  This class consists of all Allowed unsecured claims against Debtor that are held by Entities.  These Allowed claims will be paid and satisfied in full by payment from pro-rata distributions to each holder of an Allowed claim in this class after all of the 2-B class claims are paid in full.  Debtor estimates these claims at least $10,915,027.70.

C.      Appointment of Liquidating Agent and Oversight Committee.

The plan provides for the appointment of a Liquidating Agent and Oversight Committee. The Liquidating Agent will be selected by the Committee after consultation with the Debtor. The Liquidating Agent will have the power to (i) hold, manage, sell, and distribute the assets of the Post-Confirmation Estate or which are added to the Post-Confirmation Estate to the holders of Allowed administrative expense claims, priority claims, and Allowed general unsecured claims in accordance with the provisions of this Plan, (ii) prosecute and resolve any Avoidance Claims and Causes of Action on behalf of the Debtor and the Post-Confirmation Estate, (iii) prosecute and resolve any claim objections, (iv) defend, protect and enforce any and all rights and interests of the Post-Confirmation Estate, (v) retain professionals and incur any reasonable

and necessary expenses in performance of its duties, (vi) pay any and all claims, liabilities, losses, damages, costs and expenses incurred in connection with the operation of the Post-Confirmation Estate, including all fees and expenses of the Liquidating Agent and the Liquidating Agent's professionals accruing after the Effective Date, (vii) perform such other functions as are provided in the Plan, and (viii) have the power and authority to administer the closure of the Chapter 11 case. In all circumstances, the Liquidating Agent will act in the best interests of all the Post-Confirmation Estate and the holders of claims entitled to distributions under the Plan. The Liquidating Agent will be entitled to reasonable compensation and expenses, which will be reviewed by the Oversight Committee. Any objections to such compensation and expenses will be resolved by the Bankruptcy Court on motion of either party.

The Oversight Committee shall consist of three members: the Liquidating Agent and two representatives of the unsecured creditors. The Oversight Committee will monitor the Liquidating Agent and all activities set forth in this Plan. The Oversight Committee will have the power and authority to ratify or reject decisions of the Liquidating Agent, and in its discretion, the Oversight Committee may delegate to the Liquidating Agent such power and authority as it deems proper. The members of the Oversight Committee will not be paid for their services except for reimbursement of actual expenses incurred by such members.

Neither the Liquidating Agent, Oversight Committee members, nor their designees, employees, professionals, or agents will be liable for the act or omission of any other designee, employee, professional or agent, nor will the Liquidating Agent or Oversight Committee members be liable for any act or omission taken or omitted to be taken in their respective capacities, other than acts or omissions resulting from willful misconduct, gross negligence, or fraud.

D.    Treatment of Debtor's and Estate's Assets.

The Plan provides for treatment of assets belonging to the Estate and the Debtor. According to the type of asset, the interest holder, and the value, the Plan provides for payments to be made by the Debtor for abandonment of the assets.

1.    Exempt Assets.

Debtor shall be entitled to retain all property listed as exempt in the Schedules including but not limited to:

(i)     Up to $360,000.00 in equity of homestead at 965 Summit Avenue, St. Paul or sale of proceeds thereof;

(ii)    $9,900 in household goods and furnishings located at 965 Summit Avenue, St. Paul;

(iii)   Wearing apparel for Debtor and children;

(iv)   Debtor's wedding ring;

(i)     Steinway Piano to the extent allowed by law;

(v)     Debtor's watch; and

(vi)    Viola with case and bow (used by minor daughter).

To the extent that any judgment lien impairs exempt property of the Debtor that lien is avoided under Section 522(f) of the Bankruptcy Code and other applicable law.  The liens so avoided include, without limitation, the liens described with respect to Classes 1-B, 1-C, and 1-D.

Because they are exempt under the Bankruptcy Code, the Debtor is entitled to retain the Exempt Assets and, accordingly, the Plan makes no provision for payment from the Debtor for the Exempt Assets.

2.     Estate Assets.

The plan provides that as of the Effective Date and except as provided otherwise in the Plan, the Post-Confirmation Estate will continue to own all Estate Assets including but not limited to:

(i)     Remaining cash in the estate in US Bank account # ….8681 (currently $1,100,000, subject to reductions for payment of administrative costs);

(ii)    Cash in PNC money market account (#.....2547)

(iii)   Additional interest in common stock or promissory notes from Nazca (estimated at up to $1,000,000);

(iv)   All avoidance powers including those formerly held by GE;

(v)    Cabin property subject to mortgages and liens;

(vi)   Common stock in Private Bancorporation, Inc.;

(vii)  Rembrandt sketch;

(viii) 1988 Mercedes convertible;

(ix)   Beaver coat and raccoon coat(s);

(x)    All Avoidance Actions and Causes of Action except as otherwise provided in the Plan; and

(xi)   All other Estate Assets not specifically dealt with in the Plan, including any property of the Estate that was not scheduled.

The Liquidating Agent will have the power and the duty to liquidate those assets.  The Debtor may be a buyer for a price negotiated by the Liquidating Agent but the Liquidating Agent is under no obligation to sell to the Debtor.

3.    Assets to be Abandoned.

The Plan provides that certain assets will be abandoned but which, in certain cases, the Liquidating Agent may elect to retain:

(i)    Causes of Action against Corsair Aviation and David N. Kloeber, Jr.  These causes of action stemmed from business dealings between the Debtor and certain wholly owned Entities (including Entities (xxx), (xxxi), (xli), and (xxxv) listed below) and Corsair Aviation, LLC, JetChoice I, LLC, JetChoice II, LLC, and David N. Kloeber, Jr.  The Debtor held direct or beneficial ownership interests in the defendant entities, which were managed by Mr. Kloeber and which operated a private membership flying club business.  The plaintiff Entities leased aircraft to the defendant Entities.  The plaintiffs, including the Debtor, allege breach of contract claims against the defendant Entities and claims against Mr. Kloeber personally, including failure to make his share of loan payments to GE on a business jet aircraft, secretly attempting to liquidate and dissolve JetChoice I, LLC and JetChoice II, LLC without notice to or approval of its other members, promissory estoppel, and numerous violations of fiduciary duties.  Mr. Kloeber asserted counterclaims against the plaintiffs.

The parties have agreed to a stipulated Order for Judgment against Defendant Corsair Aviation, LLC for the amounts owing on the loans to both the Debtor and Mr. Kloeber but the parties have agreed not to docket the judgments without an additional court order.  On May 5, 2010 the court dismissed certain of the plaintiffs' claims because the were properly claims of JetChoice's chapter 7 bankruptcy trustee, but maintained certain other claims.  Mediation and trial in the case have been stayed by the Debtor's chapter 11 bankruptcy case.  The case is Gerald L. Trooien; JLT Aircraft Holding Company, LLC; Aircraft No. 99 Company, LLC; Walker Aircraft, LLC; Minnesota Choice Aviation II, LLC and JC Membership Investment Company, LLC vs. Corsair Aviation, LLC, JetChoice I, LLC; JetChoice II, LLC and David N. Kloeber, Jr. – (Ramsey County District Court File No. 62-CV-09-3075).

(ii)    Causes of Action against Sean T. Hargarth and Northern Freight Brokers, Inc.  These causes of action include breach of contract, breach of warranty, breach of duty of good faith and fair dealing, unjust enrichment, negligence, misrepresentation and slander of title after Defendant undertook a large remodeling project at the Cabin Property.  Defendants counterclaimed against plaintiffs for breach of contract, the account balance owing and unjust enrichment.  Defendants have also filed a mechanics lien against the real estate; plaintiffs allege that the mechanics lien is invalid.  The Court ordered that defendants pay $4,000 in attorneys fees to the Debtor but payment has still not been made.  The matter is presently set on for jury trial on May 24, 2011.  The case is Gerald L. Trooien and Janice V. Simmonds (now deceased) vs. Sean T. Harguth, individually and Northern Freight Brokers, Inc. d/b/a Gull Lake Construction – (Crow Wing County District Court File No. 18-CV-08-7317).

(iii)    Causes of Action against Peter Mansour and Barry Roitblat. The Debtor commenced this case against defendants, former executives of Sproqit, alleging violations of state securities laws, misrepresentation, and breach of fiduciary duties. Pursuant to an opinion by the Eighth Circuit Court of Appeals, the breach of fiduciary duty and misrepresentation claims were dismissed but the securities law violation claims were remanded for further consideration by the District Court. The case is <u>Trooien vs. Peter Mansour and Barry Roitblat</u> – (United States District Court for the District of Minnesota, File No. 06-CV-03197).

(iv)    Secured Notes from Sproqit.

(v)    Intellectual Property from Sproqit set forth on Schedule B-22 to Schedule B of the Debtor's Schedules.

(vi)    Earning from services performed by the Debtor after the Confirmation Date (the "Debtor's Salary").

(vii)    All potential claims against JLT Group, Inc. and Lake Region Building Management, Inc. on account of transfers made from the Debtor prior to the Filing Date. A list of such transfers during the year prior to the Filing Date is set forth on Attachment SOFA 3c to the Statement of Financial Affairs attached to the Schedules.

With the exception of the assets described in (vi) and (vii) above, the Liquidating Agent will have the right to decide not to abandon these assets within the 30 days of the Effective Date and instead to retain them and to liquidate them. The Liquidating Agent will give Mr. Trooien the opportunity to make a higher and better offer than any offer the Liquidating Agent receives.


4.    Personal Property Assets to be Abandoned for a Price.

The Plan provides that certain personal property assets will be abandoned to the Debtor in exchange for a payment. The "Personal Property Assets" are as follows:

(i)    Household goods and furnishings, including audio, video, and computer equipment listed at Schedule B.4 of the Debtor's Schedules other than those identified as "Exempt Assets;"

(ii)    Other books, pictures and other art objects, antiques, stamps, coins, records, tapes, compact discs, and other collections or collectibles; wearing apparel; furs and jewelry; firearms; and sports, photographs and other hobby equipment at Schedule B.5, B.7, and B.8 of the Debtor's Schedules, except as specifically identified as Estate Assets or Exempt Assets;

(iii)    Airline miles listed at Schedule B.35 of the Debtor's Schedules; and

(iv)    Note receivable from JLT Group, Inc. listed at Schedule B.16 of the Debtor's Schedules.

The Debtor will make a payment to the Post-Confirmation Estate in the amount of $25,000 within 90 days after the Effective Date subject to the right of the Liquidating Agent to verify the values of the Personal Property Assets and to decline to sell at this price. The Personal Property Assets will not transfer without the payment being made. If these assets remain in the estate, the Liquidating Agent may liquidate them in the same manner as other assets in the Post-Confirmation Estate.

5.      Interests to be Abandoned for a Price.

The Plan provides that on the Effective Date the ownership interests in certain Entities and all Entities holding direct or beneficial ownership interests in them (collectively, the "Abandoned Ownership Interests"), will be abandoned to the Debtor. The Abandoned Ownership Interests include ownership interests in certain Entities that with ongoing operations associated with real estate projects, a hotel, restaurant, and parking services (the "Abandoned Operating Ownership Interests") as follows:

(i)      331 Second Avenue, LLC (TriTech);
(ii)     JLT Roseville Corporate Center, LLC;
(iii)    3200 Como Associates, LLC;
(iv)     JLT Mobil Building Limited Partnership (Red Fox Road);
(v)      JLT East River Road, LLC;
(vi)     Bren Road, LLC;
(vii)    9800 Bren Property, LLC (Gateway South);
(viii)   WCB Restaurant Company ("Aperitif"), West Bend 15.5 LLC and West Biel 68 LLC;
(ix)     676 Hotel, LLC ("Sheraton St. Paul Woodbury Hotel");
(x)      JLT Group, Inc.;
(xi)     Lake Region Building Maintenance, Inc.; and
(xii)    Team Parking, LLC.

The Abandoned Ownership Interests also include certain Entities with no operations, with operations controlled by a receiver, or whose property the Entity intends to surrender to its secured lender (the "Abandoned Non-Operating Interests"), as follows:

(xiii)   10 RPP, LLC (Revenue Building);
(xiv)    Fillmore & State Holding Company, LLC;
(xv)     Shepard Road Acquisition Company, LLC;
(xvi)    Kennedy Building Associates, GP;
(xvii)   Century & Lake Holding, L.L.C.;
(xviii)  Stewart Avenue Acquisition, LLC;
(xix)    Battle Creek Lake Acquisition Company, LLC;
(xx)     North Tamarack Associates, L.L.C.;
(xxi)    River Properties of St. Paul LP;
(xxii)   Trooien & Associates LP;
(xxiii)  Alexandra & Associates, L.L.C.;
(xxiv)   Jerry Realty, LP;

| (xxv) | The Residences at The Bridges LP; |
|---|---|
| (xxvi) | Jerry Realty Corporation; |
| (xxvii) | Midway Warehouse, LP; |
| (xxviii) | Central Distribution, Inc.; |
| (xxix) | Corsair Aviation, LLC; |
| (xxx) | JLT Aircraft Holding Company, LLC; |
| (xxxi) | Minnesota Choice Aviation II, LLC; |
| (xxxii) | Minnesota Choice Aviation III, LLC; |
| (xxxiii) | Summit Aircraft, LP; |
| (xxxiv) | Summit Aircraft Corporation; |
| (xxxv) | Walker Aircraft, LLC; |
| (xxxvi) | Helicopter Acquisition Company No. 3 LLC; |
| (xxxvii) | Aircraft No. 1517 Company, LLC; |
| (xxxviii) | Aircraft No. 1074 Company, LLC; |
| (xxxix) | Helicopter Acquisition Company No. 1, LLC; |
| (xl) | Helicopter Acquisition Company No. 2, LLC; and |
| (xli) | Aircraft No. 99 Company, LLC. |

An organization chart setting forth the ownership structure of the Abandoned Ownership Interests is attached as Exhibit B.

The Plan provides that the Debtor will make payment in exchange for abandonment of these interests.  The Debtor determined the amount of these payments based on the current status of the operations in the Abandoned Operating Ownership Interests.  Entities (i) through (ix) own real estate, a hotel, or a restaurant, and each is in default under loan agreements with its respective secured lender.  Entities (x) and (xi) provide management and support services for the other Entities and their potential to earn money depends on the survival of the Entities.  Entity (xii), Team Parking, LLC, operates on real property leased from Entities (xv) and (xxiii) which have been or will be surrendered to their lenders.  A chart of the current status of the projects including negotiations with the lenders is attached as Exhibit C.  The Debtor filed financial information on the Entities for the 2009 and 2010 tax years in his Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Estate of Gerald Trooien Holds a Substantial or Controlling Interest ("Periodic Report") filed at Court docket no. 143 and the Supplement to the Periodic Report ("Supplement") filed at Court docket no. 151.  The Periodic Report and Supplement are voluminous and available from Debtor's counsel at the e-mail address provided at the end of this disclosure statement.

In the process of identifying and evaluating the value of the Abandoned Entities, the Debtor and advisor Manchester Companies prepared financial information regarding the Abandoned Operating Ownership Interests.  The report that resulted from that analysis has been filed on the Court's docket as number 162 and is also available in electronic form upon request from Debtor's counsel at the e-mail address provided at the end of this disclosure statement.  Based on the assumptions described on the report, the Debtor projects that excess cash flow from ongoing operating Entities will be paid to lenders to cure arrearages but, to the extent some cash becomes available to the owner of the Entity, it will be shared with the Post-Confirmation Estate as provided below.  In the event that the assumptions used in the report's projections are not

reflected in the actual outcome of negotiations with the Entities' lenders, cash flow could be more or less than projected.

In addition, the Debtor caused certain Entities to lodge protests to real property tax assessments. A chart summarizing the status of tax appeals is included as <u>Exhibit D</u>, which includes refunds that have been recently received. Proceeds of these and any other successful protests are payable first to the lenders or tenants who paid the taxes originally, and in the event some proceeds are available to the Entities, those may be subject to payment to tenants, lenders to cure arrearages, and other creditors of the Entities. If proceeds are available for distribution to the owner of the Entities such proceeds will be shared with the Post-Confirmation Estate as provided below.

The Plan abandons the Abandoned Non-Operating Interests for tax purposes. A thorough description of the tax consequences of acceptance of the Plan is provided in Section VIII below. By way of summary, to the extent that any of these ownership interests were to remain in the Post-Confirmation Estate, it is possible that the disposition of the underlying properties by the Liquidating Agent (or a chapter 7 trustee) could result in a gain chargeable to the estate without sufficient losses to offset the gain. Such net gains would create a priority tax claim that would reduce or consume the amount of funds distributable to unsecured creditors. Conversely, if the Abandoned Non-Operating Interests generate net losses, the losses will be trapped in the Post-Confirmation Estate and unusable for anyone's benefit. To the extent the Post-Confirmation Estate retains losses that are unused and would otherwise be lost, the Plan provides that the Debtor may decline to have certain Abandoned Non-Operating Interests abandoned to him, but not in a way that will create a tax claim in the estate. By abandoning the Abandoned Non-Operating Interests the Plan transfers the risk of a tax gain from the Post-Confirmation Estate to the Debtor.

In exchange for the abandonment of the Abandoned Ownership Interests, the Plan requires the Debtor to make the following payments:

        a.      The Entities or the Debtor will pay $20,000 per month for 12 months starting 90 days after the Effective Date or, in the alternative, the Entities or the Debtor may pay $200,000 on or before 90 days after the Effective Date. To secure payment of these amounts, the Debtor will grant to the Post-Confirmation Estate security interests in the Abandoned Ownership Interests. However, the Debtor will not be personally liable for these payments.

        b.      With the exception of Entities (x), (xi), and (xii), to the extent that any cash in any Entity on the Effective Date is not used to make payments to secured lenders or other creditors of the Entity, or to cover the cost of liquidation, and therefore becomes available to Trooien, one-half shall be paid over to the Post-Confirmation Estate.

        c.      To the extent refunds are received by an Entity for property taxes paid to the Entity prior to the Effective Date, and not used to make payments to tenants, or secured lenders or other creditors of the Entity or to cover the costs of liquidation, and

therefore becomes available to Trooien, one-half shall be paid over to the Post-Confirmation Estate.

At this point, there is no assurance that funds will be available on account of payments made under sections b. and c. However, under certain circumstances returns could become significant. In order to retain the ownership interests, the Debtor may need to attract new investments to infuse capital into some or all of the Entities.

   6.  Liens and claims against Entities to be transferred.

As a result of the Settlement Agreement entered into with GE as of March 11, 2011 and approved by the Bankruptcy Court on March 21, 2011, certain liens and claims asserted by GE prior to the Filing Date by reason of a "charging order" on the ownership interests of the Debtor in a number of partnerships and limited liability companies and claims that certain of the Entities had violated orders issued by the District Court in favor of GE, all GE liens and claims were treated as "preferences" under the Bankruptcy and were avoided under § 550 and transferred to the bankruptcy estate under § 551 of the Bankruptcy Code. Thus, the estate holds asserted liens on many of the ownership interests that are already property of the bankruptcy estate. To the extent that any of these are among the Abandoned Ownership Interests or interests are subsequently abandoned or otherwise transferred to the Debtor, the liens are released by the Plan. In addition, in consideration for the promise of the Abandoned Operating Ownership Interests to make certain payments to the estate as described above, any claims against any of the Entities for the asserted transfers are released by the Plan.

   7.  Debtor's Post-Confirmation Salary.

During the bankruptcy case the Debtor earned a combined salary from JLT Group, Inc., Lake Region Building Maintenance, Inc., and Team Parking, LLC, in the amount of $30,000 per month. The Debtor anticipates drawing a similar salary after the Effective Date depending on future business activities, which salary may be reduced if his housing expenses are reduced through the sale of the Homestead Property that is currently being marketed. The Plan does not provide that the Post-Confirmation Estate will pay any part of his salary or that the Debtor will contribute any of his post-confirmation salary to the Post-Confirmation Estate.

   E.  Claims Belonging to the Estate

On the Plan Effective Date, except as abandoned or assigned to the Debtor, the Post-Confirmation Estate is vested with and retains and may, at its option, enforce any Avoidance Claims or Causes of Action belonging to the estate. The Debtor's right to enforce these Avoidance Claims and Causes of Action exists even if a particular claim is not specifically referred to in the Plan, and no preclusion doctrine such as collateral estoppel or *res judicata* will apply on account of Plan confirmation. The Post-Confirmation Estate and Liquidating Agent may also compromise any claim, interest, or objection without notice and a hearing and without Court approval. The Liquidating Agent will be and have the powers of the "Plan Representative" under the Bankruptcy

Code.  All net recoveries on any Avoidance Claims or Causes of Action recovered by the Post-Confirmation Estate will be used for making payments under the Plan.

F.      Executory Contracts and Unexpired Leases

The Plan includes a list of executory contracts and leases that will be assumed or rejected on the Confirmation Date with proposed cure amounts, if applicable.  Unless an objection is filed prior to entry of the Confirmation Order, then any such amount shown on Exhibit A to the Plan as "cure" is conclusively determined to be the amount required to cure any monetary or non-monetary default under any assumed executory contract or lease.  All executory contracts and leases previously entered into during the case or assumed by the Debtor by prior Court order are assumed in the Plan.  If an executory contract and/or lease is not expressly assumed or rejected in the Plan, and has not been previously dealt with by prior Court order, it is deemed rejected effective on the Confirmation Date.

If rejection of a lease or contract results in a claim for damages, then the holder of such a claim **must file a proof of claim** for its rejection damage claim and must serve the proof of claim on the Debtor and their Chapter 11 counsel **within thirty (30) days** after the later of the Confirmation Date or the date on which the Debtor notifies the holder in writing of the rejection (the "Rejection Claim Bar Date"), or such claim is forever barred and is not enforceable against the Debtor or the Reorganized Debtor or his property.

G.      Distributions and Claims Administration

1.      Method of Payment.  The Plan provides that will be made by check, mailed with first class postage pre-paid, to the holder of each claim at the address listed on its proof of claim as of the Record Date, or if no proof of claim has been filed by the date of the hearing on confirmation, to the address listed on the Schedules as of the Record Date.  Holders of claims as of the Record Date may contact the Liquidating Agent to amend their addresses.

2.      The Plan provides that claims administration authority vests in the Liquidating Agent and the Post-Confirmation Estate:

(i)      Reservation of Rights to Object to Claims.  Unless a claim is specifically Allowed under the Plan, or otherwise Allowed prior to or after the Effective Date, the Liquidating Agent shall have and retain any and all objections to any and all claims and motions or requests for the payment of claims, whether administrative expense, secured or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged administrative expense claims, priority tax claims, liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.

(ii)      Filing of Objections.  Unless otherwise ordered by the Bankruptcy Court, any objections to Claims other than administrative expense claims will be filed within sixty (60) days after the Effective Date (unless such day is not a business day, in which case such deadline will be the next business day thereafter).  An objection to a claim will be deemed properly served on the claimholder if the Liquidating Agent effects service by any of the following methods:

(A) in accordance with Federal Rule of Civil Procedure 4, as allowed and made applicable by Bankruptcy Rule 7004; (B) to the extent counsel for a claimholder is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified on the proof of claim or interest or any attachment thereto or (C) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of the claimholder in the Chapter 11 case.

(iii)     Determination of Claims.  Except as otherwise agreed by the Liquidating Agent, any claim as to which a proof of claim or motion or request for payment was timely filed in the Chapter 11 case may be determined and liquidated pursuant to (A) an order of the Bankruptcy Court or (B) applicable non-bankruptcy law (which determination has not been stayed, reversed or amended and to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending), and will be deemed in such liquidated amount and satisfied in accordance with the Plan. Nothing contained in the Plan, the Disclosure Statement, or the confirmation order will constitute or be deemed a waiver of any claim, right, interest, or Cause of Action that the Liquidating Agent or the Post-Confirmation Estate may have against any person in connection with or arising out of any claim or claims, including without limitation any rights under Section 157(b) of Title 28 of the United States Code.

3.     The Plan provides the following procedures for treating and resolving disputed claims:

(i)     No Distributions Pending Allowance.  No payments or distributions will be made with respect to all or any portion of a disputed claim unless and until all objections to such disputed claim have been settled or withdrawn or have been determined by a Final Order, and the disputed claim has become an Allowed claim.

(ii)     Claim Estimation.  The Debtor or the Liquidating Agent may request estimation or limitation of any claim that is disputed, contingent or unliquidated pursuant to Section 502(c) of the Bankruptcy Code; provided, however, that the Bankruptcy Court will determine (A) whether such disputed claims are subject to estimation pursuant to Section 502(c) of the Bankruptcy Code and (B) the timing and procedures for such estimation proceedings, if any.

(iii)     No Distribution if Cause of Action Asserted.  No payment or distribution will be made with respect to all or any portion of a claim or Allowed claim held by a claimant against whom an Avoidance Claim or a Cause of Action is asserted unless and until such Avoidance Claim or Cause of Action has been settled or withdrawn or has been determined by Final Order.

4.     The Plan provides that in the event a payment is returned to the Liquidating Agent unclaimed, with no indication of the payee's forwarding address, the Liquidating Agent will hold such payment for a period of three months from the date of return.  If not claimed by the payee by the end of that period, the payment will become property of the Post-Confirmation Estate.  In the event there are unclaimed funds and redistribution to other holders of claims in Class 2-B is impractical, the Liquidating Agent may contribute such funds to one or more pro bono

organizations whose mission is the delivery of free bankruptcy legal services to those who cannot afford to pay for such services.

5. The Plan provides that if proof of a claim is required under Bankruptcy Rule 3003 and is not timely filed according to the provisions of the Bankruptcy Code or applicable Final Order in the Chapter 11 case, the holder of such claim will not be treated as a creditor for purposes of distribution under the Plan and will receive no distribution under the Plan on account of such claim.

H. Effect of Confirmation

Discharge. The confirmation of the Plan will **immediately** discharge the Debtor of all claims against him except to the extent that the claims are preserved by the Plan. *The Debtor will have the full benefit of Section 1141 of the Bankruptcy Code upon the Effective Date of the Plan.* The language of the Plan is as follows:

(a) Discharge. Except as otherwise provided in this Plan, confirmation of this Plan **immediately** entitles the Debtor to full benefit of section 1141 of the Bankruptcy Code and discharges, waives and releases the Debtor from any debt that arose before the Confirmation Date and any debt of a kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, regardless of whether or not proof of the claim based on such debt was filed or deemed filed under Section 501 of the Bankruptcy Code, such Claim is allowed under Section 502 of the Bankruptcy Code, or the holder of such claim has accepted the Plan. The payments of, distributions on account of, or treatments of claims in this Plan are deemed to satisfy in full all claims. All assets and other property of Debtor and the estate is dealt with by this Plan; therefore, on the Effective Date, all assets and other property of the Debtor vests in the Liquidating Trust and such property is free and clear of all liens, encumbrances, claims and interests of creditors and equity security holders, except to the extent the Plan explicitly provides that such liens, encumbrances, claims or interests are retained.

(b) Injunction Related to Discharge. As of the Effective Date and subject to its occurrence, all persons that have held, currently hold or may have asserted a Claim, a Cause of Action or other debt, liability, Interest or other right that is discharged, released or terminated pursuant to the Plan, are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, enforcing, collecting or recovering in any manner any judgment, award, decree or order, creating, perfecting or enforcing any lien or encumbrance, asserting a set-off, right or subrogation or recoupment of any kind against any debt, liability or obligation due to any such releasing Person, and from commencing or continuing any action, in any manner or in any place where the foregoing does not comply with or is inconsistent with the provisions hereof.

VI.     PROOFS OF CLAIM AND ADMINISTRATIVE EXPENSE CLAIMS.

The deadline for non-governmental entities to file proofs of claim in these cases was March 22, 2011.  The deadline for governmental entities was April 25, 2011.  The procedures of distribution on claims and for objections to claims is set out in Article V(F) above.  Local Bankruptcy Rules govern the method of filing of administrative expense claims and the Court's order approving the Plan will set a bar date for filing such claims.


VII.    TAX CONSEQUENCES OF THE PLAN.

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtor, the bankruptcy estate, and holders of general unsecured claims.  This summary does not address the federal income tax consequences to holders of allowed administrative expense claims, priority claims, or secured claims.  This summary does not address foreign, state or local income tax consequences, or any estate or gift tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers.  Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a claim.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH HOLDER.  THIS SUMMARY DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED.  THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

A.      Federal Income Tax Consequences to the Bankruptcy Estate and the Debtor.

Under Section 1398 of the Internal Revenue Code of 1986, as amended (the "IRC"), a separate bankruptcy estate is created if an individual debtor commences a bankruptcy under either Chapter 7 or Chapter 11 of Title 11 of the U.S. Code.  The taxable year of the bankruptcy estate begins on the day on which the bankruptcy case commences.  Transfers of assets from an individual debtor to the bankruptcy estate by reason of the bankruptcy (other than by sale or exchange) will be non-taxable transfers.  Under IRC Section 1398(g), the bankruptcy estate succeeds to and takes into account the tax attributes of the debtor, such as net operating loss carry-forwards, credit carryovers, capital loss carryovers, basis, holding period and character of the assets.  Such tax attributes are determined as of the first day of the debtor's taxable year in which the case commences.  As of January 1, 2010, the first day of the Debtor's taxable year in which the case commenced, the Debtor had the following tax attributes:

- Net operating losses of $6,891,145.

- At-risk losses of $1,340,317.

- Capital loss carry-forwards of $364,694.

- Passive loss carry-forwards of $37,255,997.

The total of all of the above is $45,852,153 (the "Tax Attributes").

Under IRC Section 1398(e)(1), the gross income of the bankruptcy estate includes the gross income of the debtor to which the bankruptcy estate is Entitled under the Bankruptcy Code. The general rule under IRC Section 108 is that except for the specific exceptions described in IRC Section 108, gross income includes income from the discharge of indebtedness. If, however, the discharge of indebtedness occurs in a Title 11 case, then gross income does not include any amount which would otherwise have been included in gross income by reason of the discharge. This bankruptcy exception under IRC Section 108 will apply to a debtor only if the debtor is under the jurisdiction of a court under a Title 11 case and a discharge of indebtedness is granted by the court or is pursuant to a plan approved by the court.

IRC Section 108 in many respects treats the exclusion of income from the discharge of indebtedness under the bankruptcy exception as a mere postponement of income rather than a total escape from taxation. The method by which IRC Section 108 accomplishes this is by mandating reductions of certain tax attributes of the debtor equal to the amount of the income exclusion. These tax attributes include net operating losses, general business credits, capital losses, passive losses, and a reduction in the basis of assets. These reductions in tax attributes are made _after_ the determination of the income tax for the taxable year of the discharge. Under the bankruptcy exception, if the amount of the income exclusion exceeds available tax attributes, there will be a permanent exclusion of income from the discharge of indebtedness since tax attributes cannot be reduced below zero.

Gross income also includes any gain from the sale or exchange of property owned by the bankruptcy estate. For tax purposes, a foreclosure transaction (whether involuntary or voluntary where a deed in lieu of foreclosure is given) essentially represents a sale or exchange of property in satisfaction of a debt. If the debt is recourse, the Internal Revenue Service regulations generally treat the transfer of property in satisfaction of a debt as two separate transactions. These two transactions are:

(a)    the debtor recognizes gain (or loss) equal to the difference between the fair market value of the property being transferred and the debtor's basis in the property; and

(b)    the debtor recognizes forgiveness of indebtedness income to the extent that the amount of the debt forgiven exceeds the fair market value of the property.

Thus, the bankruptcy estate can incur either a gain or a loss on the transfer of the property based on the fair market value of the property transferred. Any gain can be offset against the tax attributes of the debtor transferred to the bankruptcy estate. Any losses will be added to the tax attributes. Amounts in excess of the fair market value of the property will be excluded as taxable income to the bankruptcy estate by reason of the bankruptcy exception. The amount excluded under the bankruptcy exception will eventually be used to reduce or eliminate any tax attributes held by the bankruptcy estate.

A distinction is drawn between recourse and non-recourse debt. If the debt is non-recourse, then the face value of the debt is treated as the amount realized from the sale even if the amount of the debt is in excess of the fair market value of the property. In effect, the difference between the face amount of the debt and its basis will be treated as gain or loss from the disposition of the property and the debtor is not eligible to use the exclusions under IRC Section 108.

Under Section 506(a) of the Bankruptcy Code, however, a secured creditor's security is reduced to the value of the underlying property, and any excess is treated as an unsecured claim. The unsecured portion of the claim is eligible to be discharged in the bankruptcy proceeding. This resulting discharge of indebtedness income will be eligible for the bankruptcy exception under IRC Section 108. In effect, the amount of gain that will be realized on a transfer of the property and that is not excludible under the bankruptcy exception under IRC Section 108 is limited to the excess of the property's fair market value over its basis – a result consistent with the recourse debt analysis.

In general, to the extent that a sale or exchange occurred before the filing date, the gain or loss resulting from such sale or exchange will be allocated to the debtor. Similarly, to the extent that a sale or exchange occurred on or after the filing date, the gain or loss from the sale or exchange will be allocated to the bankruptcy estate. There are some exceptions to this general rule. If the sale or exchange was made by an entity that is a pass-through entity such as a partnership or an S corporation, the allocation of gain or loss may depend on the ownership of the entity on the last day of the entity's tax year. This is due to the fact that income, gain or loss of a pass-through entity such as a partnership or an S corporation, is deemed to have occurred on the last day of the entity's tax year.

Instead of selling or exchanging the property transferred to it, the bankruptcy estate may choose instead to abandon the property to the debtor. If property is abandoned by the bankruptcy estate and distributed to the debtor, the transfer will be treated as tax-free and the debtor will usually have a basis in the property equal to that of the bankruptcy estate. If the property is subject to debt, whether the debt is recourse or non-recourse, the debtor will be able to exclude from taxation any forgiveness of indebtedness income under the bankruptcy exception. The debtor will, however, be liable for any gain from the foreclosure.

As described above, the bankruptcy estate succeeds to and takes into account the debtor's unused passive losses and unused passive credits. If, before the termination of the bankruptcy estate, the bankruptcy estate transfers an interest in a passive activity or former passive activity to the debtor through an abandonment, the bankruptcy estate must allocate to the transferred interest part or all of the bankruptcy estate's unused passive losses and unused passive credits to the debtor associated with the activity transferred. These passive losses would be available to offset any gain generated by the disposition of the property to which the passive losses relate. A similar treatment occurs with respect to at-risk losses. Except for the carryover of basis, the allocation of unused passive losses and passive credits, and the allocation of at-risk losses, the abandonment of property to the debtor does not result in the transfer of additional tax attributes to the debtor.

Upon termination of the bankruptcy estate, the debtor succeeds to and takes into account any remaining tax attributes that were not used by the bankruptcy estate. As described above, tax attributes can be used not only to offset taxable income of the bankruptcy estate, but will be reduced by the amount of any income excluded from the discharge of indebtedness as a result of the bankruptcy exception to IRC Section 108.

A significant portion of the property transferred to the bankruptcy estate by the Debtor consists of interests in the Entities. For tax purposes, the Entities will either be treated as disregarded entities or regarded entities. A disregarded entity, such as a single member limited liability company, is treated for tax purposes as if the entity did not exist on the property or the property owned by the disregarded entity was owned directly by the equity holder. A regarded entity may either be a separate tax paying entity, such as a C corporation, or a pass-through entity, such as a partnership or an S corporation. A pass-through entity does not itself pay tax on its income, but passes through its income to its owners. Limited liability companies are generally taxed as pass-through entities.

Any sale or exchange of the ownership of the property owned by the Entities or any sale or exchange of the ownership of the Entities, including any foreclosure on the property or the ownership interests, will constitute a taxable event resulting in gain or loss for income tax purposes. Most of the properties owned by the Entities have a low tax basis so that when there is a sale or exchange, it is likely that the fair market value of the properties will exceed the basis and result in gain for income tax purposes. A chart setting forth the debt, basis, and tax attributes associated with the Entities is attached as Exhibit E. The total amount of gain will likely be significant, and could potentially exceed all of the Tax Attributes that might be used to offset the gain. As described above, an abandonment of the Entities by the bankruptcy estate does not constitute a sale or exchange and would not be a taxable event for the bankruptcy estate. If there is an abandonment of the Entities to the Debtor, both the ownership of the Entities and the passive losses and at-risk losses associated with such Entities will pass to the Debtor. Other Tax Attributes will remain with the bankruptcy estate. If an Entity is a pass-through entity and a sale or exchange (including a foreclosure) of property owned by such Entity occurred on or after the filing date and before abandonment, but an abandonment thereafter occurs prior to the last day of the Entity's tax year, gain or loss from such sale or exchange may be allocated to the Debtor rather than the bankruptcy estate.

By abandoning the ownership interest in the Entities to the Debtor as described in the Plan, the Debtor and not the bankruptcy estate will be responsible for the tax consequences associated with the sale or exchange of the Entities or the property held by the Entities. It is the intent of the Plan to eliminate any taxable income in the bankruptcy estate that exceeds the Tax Attributes available to the bankruptcy estate. If there is taxable income in the bankruptcy estate that exceeds the Tax Attributes that could be used to reduce such taxable income, the resulting administrative priority tax claim could eliminate the chance of a distribution to unsecured creditors.

To the extent a sale or exchange allocable to the bankruptcy estate has already occurred or is otherwise unavoidable, the bankruptcy estate will file the necessary tax returns and apply Tax Attributes to prevent the bankruptcy estate from having taxable income. If necessary, and only to the extent necessary, to assure that there will be no taxable income to the bankruptcy

estate, the Debtor will decline to accept some Abandoned Ownership Interests so as to leave passive losses or at-risk losses in the Post-Confirmation Estate for the purpose of reducing potential taxable income. The Liquidating Agent and the Debtor will cooperate to help achieve this goal. The passive losses and at-risk losses allocated to the Debtor as a result of the abandonment of the Entities will permit the Debtor to offset gains that will be allocated to the Debtor.

Due to the significant amount of excluded income from the forgiveness of indebtedness resulting from application of the bankruptcy exception to IRC Section 108, it is anticipated that all remaining Tax Attributes in the bankruptcy estate will be utilized. Consequently, the Debtor will not succeed to any additional Tax Attributes upon termination of the bankruptcy estate.

        B.      Federal Income Tax Consequences to Holders of General Unsecured Claims.

In accordance with the Plan, some classes of holders of general unsecured claims will receive a distribution on such claims. Any holder of a general unsecured claim will realize a loss in an amount equal to such claim, minus any recovery, on an adjusted tax basis.

The tax consequences to holders of general unsecured claims will differ and will depend on factors specific to such holder, including but not limited to: (i) whether the claim, or a portion thereof, constitutes a claim for interest or principal, (ii) the origin of the claim, (iii) the type of consideration received in exchange for the claim, (iv) whether the holder is a United States person or a foreign person for tax purposes, (v) whether the holder reports income on the accrual or cash basis method, and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the claim.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCES TO EACH HOLDER OF A GENERAL UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A GENERAL UNSECURED CLAIM OBTAIN HIS, HER OR ITS OWN PROFESSIONAL TAX ADVISE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF A GENERAL UNSECURED CLAIM AS A RESULT OF THE PLAN.

        C.      Withholding and Reporting.

Payments of interest, dividends, and certain other payments are generally subject to backup withholding currently at the rate of 28% unless the payee furnishes his, her or its correct taxpayer identification number to the payor. The bankruptcy estate and/or the Liquidating Agent may be required to withhold the applicable percentage of any payments made to a holder who does not provide his, her or its taxpayer identification number. Backup withholding is not an additional tax, but an advance payment that may be refunded to the extent it results in an overpayment of tax.

THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE

COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

## VIII.   ALTERNATIVES TO THE PLAN.

The alternative to the Plan is liquidation under Chapter 7 of the Bankruptcy Code. The Debtor believes that if this case is converted to a case under Chapter 7, the Entities would cease operating and their going concern values would be lost. To preserve value, a Chapter 7 Trustee would need to see that the service company Entities would continue operating and providing services to the commercial real estate Entities. Although Chapter 7 trustees have the authority to operate businesses in Chapter 7, they rarely do so for fear of incurring administrative expenses that cannot be paid. The Entities would not continue operating on their own. As a result, any going concern value of any of the Entities would be lost and the Chapter 7 Trustee would be left to liquidate only the tangible assets, essentially the same assets that the Liquidating Agent will liquidate under the Plan. The difference is that the Plan presents the prospect of adding value to be received for the going concern values of the Entities.

The question may be asked whether a Chapter 7 Trustee would be able to sell the ownership interests in the Entities or to cause the Entities to sell their assets. The Debtor believes that conversion to Chapter 7 will cause the secured lenders to accelerate their foreclosure efforts and abandon settlement discussions. More significantly, the gains that would result by sale or other disposition by the estate may well result in income tax obligations of the bankruptcy estate that would mean that the prepetition creditors will receive nothing. Rather than run that risk, the Chapter 7 Trustee would likely abandon all of those interests and thereby receive nothing for their going concern values.

Attached as <u>Exhibit F</u> is an analysis of expected recoveries to creditors under the Plan or under a hypothetical chapter 7 liquidation. That analysis demonstrates that, on balance, and considering the interests of all creditors, parties are better off under the Plan than under a conversion of the case to chapter 7.

The overall recovery to unsecured creditors under the Plan is estimated at 2.20 to 3.95% of their claims. See Exhibit F.

## IX.   ACCEPTANCE AND CONFIRMATION OF THE PLAN.

### A.   General Confirmation Requirements.

Bankruptcy Code section 1129(a) contains several requirements for confirmation of a plan. Among these requirements are that a plan be proposed in good faith, that certain information be disclosed regarding payments made or promised to be made to insiders, and that

the plan comply with the applicable provisions of Chapter 11. The Debtor believes that he has complied with these requirements, including those requirements discussed below.

B.    Best Interests Test.

The "best interests of creditors" test requires that the Bankruptcy Court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim or interest of each impaired class of claims or interest will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate what holders of Claims would receive if the Debtor was hypothetically liquidated under Chapter 7 of the Bankruptcy Code, the Court must first determine the dollar amount that would be realized from the liquidation (the "Chapter 7 Liquidation Fund") of the Debtor. The Chapter 7 Liquidation Funds would consist of the net proceeds from the disposition of the Debtor's assets (after satisfaction of all valid liens) augmented by the cash held by the Debtor and recoveries on actions against third parties, if any. The Chapter 7 Liquidation Funds would then be reduced by the costs of the liquidation. The costs of the liquidation under Chapter 7 would include the fees and expenses of a trustee, as well as those of counsel and other professionals that might be retained by the trustee, selling expenses, and unpaid expenses incurred by the Debtor during their Chapter 11 cases (such as fees for attorneys, financial advisors and accountants) which would be allowed in Chapter 7 proceedings, interest expense on secured debt and claims incurred by the Debtor during the pendency of the case. These claims would be paid in full out of the Chapter 7 Liquidation Funds before the balance of the Chapter 7 Liquidation Funds, if any, would be made available to holders of unsecured Claims. In addition, other claims which would arise upon conversion to a Chapter 7 case would dilute the balance of the Chapter 7 Liquidation Funds available to holders of claims. Moreover, additional claims against the Debtor's estate might arise as the result of the establishment of a new bar date for the filing of claims in Chapter 7 cases. The present value of the distributions out of the Chapter 7 Liquidation Funds (after deduction the amounts described above) are then compared with the present value of the property offered to each of the classes of claims and holders of interests under the Plan to determine if the Plan is in the best interests of each holder of a claim.

The Debtor believes that the Plan as proposed is in the best interest of all creditors. If impaired creditors do not accept the Plan and the Debtor was forced to liquidate its remaining assets in Chapter 7, such creditors will receive an estimated 1.97% distribution on account of their claims. As explained in Article IV(B) above, that distribution may be lost to a priority tax claim in the event there are taxable gains in excess of tax attributes.

Under the Plan, the Debtor projects that holders of secured claims will receive either payment of the full amount of their claims or a negotiated payment. Holders of unsecured claims will receive some distribution on account of their claims. The Plan maximizes the value of the Debtor's Assets and shifts the risk of tax liability from the Post-Confirmation Estate to the Debtor. In addition, it reduces the potential costs and delays associated with a Chapter 7 liquidation, such as: (a) the substantial time which would elapse before creditors would receive any distribution in respect of their claims due to a trustee's need to become familiar with the

Chapter 11 case and the Debtor's and the Entities' books and records, and the trustee's duty to conduct independent investigations; (b) the additional unsecured claims that may be asserted against the Debtor or not negotiated if the trustee abandoned the respective ownership interests; (c) the uncertainty of a trustee's ability to retain key personnel of the Entities to assist in continuing operation of the Entities while liquidating Debtor's assets; (d) the lack of the trustee's knowledge, and the likely inability of the trustee to retain key personnel who can provide such knowledge regarding Debtor's Assets; and (e) the substantial cost and delay which can be avoided by a largely consensual plan. Accordingly, Debtor believes the Plan meets the best interests test.

C.      Financial Feasibility Test.

In addition to the requirements discussed above, the Bankruptcy Code requires that consummation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor. In this case, the Plan provides the Debtor an opportunity to work out the finances of the Entities and provide an additional return to the creditors. The Plan strikes a balance between providing the maximum possible recovery for creditors and providing the Entities with sufficient leadership and working capital to effect their own reorganizations. To the extent the Debtor is unable to make to payments provided under the Plan, the Post-Confirmation Estate will hold security interests in the Abandoned Ownership Interests and will have the power to liquidate them outside a bankruptcy case. Accordingly, the Debtor believe that the Plan passes the feasibility test.

*[Remainder of page intentionally left blank.]*

X.      CONCLUSION.

The Plan offers the best alternative for payment to creditors. If the estate were merely liquidated in a Chapter 7 case, returns to creditors would be delayed, asset values would not be maximized, and claims would likely increase. Accordingly, the Debtor requests that each holder of a claim accept the proposed Plan and complete and return the ballot.


Dated: March 21, 2011                        _____
                                                          Gerald Trooien, Debtor


                                             FREDRIKSON & BYRON, P.A.

Dated: March 21, 2011                        /s/ James L. Baillie
                                             James L. Baillie (#3980)
                                             Douglas W. Kassebaum (#0386802)
                                             Cynthia A. Moyer (#0211229)
                                             Sarah M. Gibbs (#0390238)
                                             200 South Sixth Street, Suite 4000
                                             Minneapolis, MN 55402
                                             Phone (612) 492-7000
                                             Fax (612) 492-7077
                                             jbaillie@fredlaw.com
                                             dkassebaum@fredlaw.com
                                             cmoyer@fredlaw.com
                                             sgibbs@fredlaw.com

                                             ATTORNEYS FOR DEBTOR

# EXHIBIT A

# PLAN DEFINITIONS

"<u>Abandoned Ownership Interests</u>" has the meaning set forth in Article V(h).

"<u>Allowed</u>" means with respect to any claim, (a) a claim that has been scheduled by the Debtor in its Schedules as other than disputed, contingent or unliquidated and as to which the Debtor or any other party-in-interest has not filed an objection; (b) a claim that either is not a contested claim or has been allowed by a Final Order; (c) a claim that is determined by the Debtor to be allowed; (d) a claim that is allowed in a stipulation or settlement executed prior to or after the Effective Date; (e) a claim relating to a rejected executory contract or unexpired lease that is not a contested claim or has been allowed by a Final Order, only if a proof of claim has been timely filed; or (f) a claim as to which a proof of claim has been timely filed and as to which the Debtor or any party-in-interest has not filed an objection; and with respect to all claims, only after reduction for applicable setoff and similar rights of the Debtor.

"<u>Avoidance Claim</u>" means any claim of the Debtor or the bankruptcy estate pursuant to Sections 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>" or "<u>Code</u>" means Title 11 of the United States Code.

"<u>Bankruptcy Rule</u>" or "<u>Rule</u>" means a Federal Rule of Bankruptcy Procedure.

"<u>Cabin Property</u>" means 22759 E. Lake Hubert Dr., Lake Edward Twp., MN, Crow Wing County legally described as:

> That part of Government Lot 1, Section 30, Township 135, Range 28 West, Crow Wing County, Minnesota, described as follows:
>
> Commencing at the Northeast corner of said Section 30; thence North 88 degrees 49 minutes 30 seconds West, assumed bearing, along the North line of said Section 30 for a distance of 1040.00 feet; thence South 21 degrees 28 minutes 30 seconds West 763.45 feet to the point of beginning of the tract to be herein described; thence South 37 degrees 37 minutes 10 seconds West along the Westerly right of way line of East Lake Hubert Drive 175.47 feet; thence North 52 degrees 23 minutes 00 seconds West 175 feet, more or less, to the shoreline of LAKE HUBERT; thence Northeasterly along said shoreline to the intersection with a line bearing North 60 degrees 27 minutes 00 seconds West from the point of beginning; thence South 60 degrees 27 minutes 00 seconds East 191 feet, more or less, to the point of beginning.

"<u>Causes of Action</u>" means any and all actions, proceedings, causes of action (including, without limitation, any causes of action of a debtor or debtor in possession under chapter 5 of the Bankruptcy Code such as the Avoidance Claims), liabilities, obligations, suits, reckonings, covenants, contracts, controversies, agreements, promises, rights to legal remedies, rights to

equitable remedies, rights to payment and claims, rights to object to claims, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured or whether asserted or assertable directly or derivatively, in law, equity or otherwise, and all rights thereunder or attendant thereto.

"Committee" means the official committee of the unsecured creditors in this Bankruptcy Case.

"Confirmation Date" means the date on which the Confirmation Order is entered.

"Confirmation Order" means the order confirming this Plan.

"Court" means a United States Bankruptcy Judge for the District of Minnesota, or any other court having competent jurisdiction to issue an order in this case.

"Debtor" means Gerald Trooien.

"Disclosure Statement" means the Disclosure Statement In Support of Debtor's Plan of Liquidation dated March 21, 2011 as modified or amended.

"Effective Date" means the 15th day following the day on which the Confirmation Order becomes a Final Order and the conditions of Article XII have been satisfied.

"Entities" means, for purposes of this Plan, any corporation, partnership, limited liability company or similar organization reorganized as a legal person which is owned in whole or in part by Debtor, including but not limited to those listed on Attachment B-13/14 to Schedule B of the Schedules.

"Estate Assets" means all the right, title, and interest in and to property of whatever type or nature owned by the Debtor which is and remains property of the estate for purposes of Sections 541 and 1115 of the Bankruptcy Code, including Avoidance Claims and Causes of Action.

"Exempt Property" has the meaning set forth in Article V(d)(1) of the Plan.

"Filing Date" means October 25, 2010.

"Final Order" means an order of the Court which has not been reversed, stayed, modified, or amended and the time to appeal from such order has expired. The plan proponent may elect to waive provisions relating to appeal and treat any order of this Court as a Final Order and may distribute and otherwise proceed under this Plan, even if there is a pending motion to extend time for appeal or a pending appeal, unless the order is stayed.

"GE" has the meaning set forth in Article IV, Class 1-D.

"Homestead Property" means 965 Summit Avenue, St. Paul, MN legally described as:

> The East 1/2 of the West 1/2 of Lot 17, and the East 1/2 of Lot 17, and all of Lots 18 and 19, Block 28, Summit Park Addition to St. Paul, Ramsey County, Minnesota

or if the real property is sold, the proceeds of such sale.

"Liquidating Agent" means the individual selected by the Committee, with the consent of the Debtor, prior to the Confirmation Date, and approved by the Court to undertake and perform the rights, powers, duties and responsibilities of the Liquidating Agent set out in this plan.

"Oversight Committee" means the committee of three persons that, prior to the Effective Date, will be comprised of the Liquidating Agent and two unsecured creditors approved by the Court.

"Plan" means this Debtor's Plan of Liquidation as amended or modified.

"Post-Confirmation Estate" means the continuation after the confirmation of this Plan of the bankruptcy estate created under the Bankruptcy Code at the filing of this chapter 11 case.

"Record Date" means the last date on which a claim transfer will be recognized. The Record Date is the Confirmation Date.

"Schedules" means the schedules of Assets and liabilities of Debtor and the Statement of Affairs on file with the Clerk of the United States Bankruptcy Court for the District of Minnesota, as amended or modified in accordance with Bankruptcy Rule 1009.

**EXHIBIT B**

**<u>Ownership of Entities</u>**



**Gerald Trooien**

99% — Kennedy Building Associates, GP

100% — Hiawatha Acquisitions, LLC

100% — Central Distribution, Inc.

63.83% — Midway Warehouse, LP

Joe Meyer — 3% — Midway Warehouse, LP

100% — Midway Warehouse, Inc. — 1% — Midway Warehouse, LP

Central Distribution, Inc. — 32.17% — Midway Warehouse, LP

100% — Tritech .67, LLC

100% — Tritech 1.08, LLC

1% — North Prior, LLC

100% — North Prior Corporation — 302A

North Prior Corporation — 99% — North Prior, LLC

North Prior Corporation — 100% — Roseville Corporate Center Corp. — 302A

Hiawatha Acquisitions, LLC — 31.55% — 9800 Bren Property, LLC

Midway Warehouse, LP — 68.45% — 9800 Bren Property, LLC

Midway Warehouse, LP — 100% — West Biel 68, LLC

Midway Warehouse, LP — 68.93% — 331 Second Avenue, LLC

Tritech .67, LLC — .67% — 331 Second Avenue, LLC

Tritech 1.08, LLC — 1.08% — 331 Second Avenue, LLC

North Prior, LLC — 13.98% — 331 Second Avenue, LLC

Midway Warehouse, LP — 15.3% — 331 Second Avenue, LLC

1% — Kennedy Building Associates, GP

North Prior, LLC — 99% — JLT Roseville Corporate Center, LLC

Roseville Corporate Center Corp. — 1% — JLT Roseville Corporate Center, LLC



**Gerald Trooien**

- Bielenberg Corporation — 100% · 302A
- Midway Warehouse, LP — 31% · See p. 1 for ownership
- JLT Holding Company, Inc. — 100%
- The Bridges Residences Corporation — 100% · 302A
- Jerry Realty Corp. — 100% · 302A

676 Bielenberg, LP — Bielenberg Corporation 1%, Midway Warehouse, LP 68%

676 Bielenberg, LP → 676 Hotel, LLC — 100%

North Tamarack Associates, LLC — 100%

Alexandra & Associates, LLC — 100%

JLT Group, Inc. — 100%

Lake Region Building Maintenance, Inc. — 100%

Team Parking, LLC — 100%

The Residences at the Bridges, LP — 1% / 99%

Jerry Realty LP — Jerry Realty Corp. 1%, Gerald Trooien 99%

Jerry Realty LP → The Bridges Realty, LLC — 100%



**Gerald Trooien**

- 100% — Revenue Building Corp. 302A
  - 1% — Revenue Building, LP
    - 100% — 10 RPP, LLC
- 99% — Revenue Building, LP
- 100% — Fillmore & State Holding Company, LLC
- 100% — Shepard Road Holding Company, LLC
  - 1% — Shepard Road Acquisition Company, LLC
- 99% — Shepard Road Acquisition Company, LLC
- 100% — WCB Restaurant Company
- 100% — West Biel 15.5, LLC
- 100% — 3200 Como Associates, LLC



**Gerald Trooien**

100%

JLT Real Estate Company

302A

99%

1%

1%

99%

1%

99%

100%

100%

100%

100%

100%

JLT Mobil Building LP

River Properties of St. Paul LP

Trooien & Associates, LP

JLT East River Road, LLC

Bren Road, LLC

Century & Lake Holding, LLC

Stewart Avenue Acquisition, LLC

Battle Creek Lake Acquisition Company, LLC



**Gerald Trooien**

100% — JC Membership Invest Company LLC
50% — Minnesota Choice Aviation II, Inc.
50% — Minnesota Choice Aviation III, Inc.
100% — Summit Aircraft Corporation 302A
99%

34.36932% — Corsair Aviation, LLC
1% / 49.5% — Minnesota Choice Aviation II, LP
1% / 49.5% — Minnesota Choice Aviation III, LP
100% — JLT Aircraft Holding Company, LLC
1% — Summit Aircraft LP

100% — Jet Choice I, LLC / Capital Wings Airline, Inc. / ACM Aviation, LLC
100% — Minnesota Choice Aviation II, LCC
100% — Minnesota Choice Aviation III, LCC

Walker Aircraft, LLC
Aircraft No. 1074 Company, LLC
Aircraft No. 149 Company, LLC
Aircraft No. 1517 Company, LLC
Aircraft No. 21 Company, LLC
Aircraft No. 23 Company, LLC
Aircraft No. 600 Company, LLC
Aircraft No. 99 Company, LLC
Helicopter Acquisition Company No. 1, LLC
Helicopter Acquisition Company No. 2, LLC
Helicopter Acquisition Company No. 3, LLC

**EXHIBIT C**

# STATUS OF ENTITIES

|  | ENTITY | PROJECT | COMMENTS | CASH IN ENTITY (1) |
|---|---|---|---|---|
| (i) | 331 Second Avenue, LLC | TriTech | C-III is the loan servicer. The property is in foreclosure. Counsel for lender has requested a receivership. A proposal to keep this property has been made to the servicer. As of this date, phone calls have been exchanged but there have been no substantive discussions. Future cash flow and/or outside cash would be needed to cure delinquent mortgage and real estate tax payments. | 446,123.78 |
| (ii) | JLT Roseville Corporate Center, LLC | Roseville | C-III is the loan servicer. The property is in foreclosure. Counsel for lender has requested a receivership. A proposal to keep this property has been made to the servicer. As of this date, phone calls have been exchanged but there have been no substantive discussions. Future cash flow and/or outside cash would be needed to cure delinquent mortgage and real estate tax payments. | 965,560.34 |
| (iii) | 3200 Como Associates, LLC | Como | C-III is the loan servicer. The property is in foreclosure. Counsel for lender has requested a receivership. A proposal to keep this property has been made to the servicer. As of this date, phone calls have been exchanged but there have been no substantive discussions. Future cash flow and/or outside cash would be needed to cure delinquent mortgage and real estate tax payments. | 194,733.53 |

| | ENTITY | PROJECT | COMMENTS | CASH IN ENTITY (1) |
|---|---|---|---|---|
| (iv) | JLT Mobil Building Limited Partnership | Red Fox Road | A receiver is in place for this property. The cash flow on this property covers debt service and taxes, but the excess is used by lender to cover part of the debt service and taxes on East River Road (vacant land), with which it is cross-collateralized. The entity had raised the prospect of selling the land and restructuring the loan on the building. The lender sent notice of default on February 3, 2011 and indicated on February 7, 2011 its intention to pursue its remedies rather than negotiate. | 2,846.88 |
| (v) | JLT East River Road, LLC | East River Road Vacant Land | See #5 above. (The property is not yet under receivership.) | |
| (vi) | Bren Road, LLC | Bren Road or Minneapolis Gift Mart | Dougherty is the lender. This is under discussion. | 26,346.67 |
| (vii) | 9800 Bren Property, LLC | Gateway | C-III is the loan servicer. The property is in foreclosure. A receiver is currently in place for this property. As of the time of this chart, there have been no substantive discussions as to a workout. Future cash flow and/or outside cash would be needed to cure delinquent mortgage and real estate tax payments. | 366.96 |
| (viii) | WCB Restaurant Company, West Biel 15.5 LLC and West Biel 68 LLC | Restaurant or Aperitif | Dougherty has a mortgage junior to a significant amount of mechanic's liens on Lot 13 of West Biel. Dougherty's mortgage is under discussion. Aperitif Restaurant was closed on February 28, 2011 and a receiver for the mechanic's lien holders is in place for the restaurant. | |

| | ENTITY | PROJECT | COMMENTS | CASH IN ENTITY (1) |
|---|---|---|---|---|
| (ix) | 676 Hotel, LLC | Hotel or Sheraton Woodbury | Dougherty has a mortgage. A loan modification is under discussion. | 98,874.09 |
| (x) | JLT Group, Inc. | JLT | There is a BofA judgment lien. It has no independent value. It may have the potential to earn money in the future based on providing future services. | (963.64) |
| (xi) | Lake Region Building Maintenance, Inc. | Lake Region | It has no independent value. It may have the potential to earn money in the future based on providing future services. | 78,023.91 |
| (xii) | Team Parking, LLC | Team Parking | A portion of the property used by this business is under foreclosure. Another part is subject to the Dougherty mortgages. It has no independent value. It may have the potential to earn money in the future based on providing future services. | 77,835.63 |
| (xiii) | 10 RPP, LLC | River Park Plaza | Discussions focus on possibility of continued management of property. The cash flow is in control of lender. Contemplated surrender of property or consent to foreclosure. | 19,368.78 |
| (xiv) | Fillmore & State Holding Company, LLC | Fillmore & State | In foreclosure. Receiver is in control of the property. Contemplated surrender of property or consent to foreclosure. | |
| (xv) | Shepard Road Acquisition Company, LLC | Shepard Road | In foreclosure. Receiver is in control of the property. Contemplated surrender of property or consent to foreclosure. | |

|  | ENTITY | PROJECT | COMMENTS | CASH IN ENTITY (1) |
|---|---|---|---|---|
| (xvi) | Kennedy Building Associates | Kennedy Building | This was evaluated for retention, but cash flow is break-even only. It is now under consideration to surrender per request of lender as of February 7, 2011. | 3,813.18 |
| (xvii) | Century & Lake Holding, L.L.C. | Century & Lake | Not making loan payments and in workout talks with lender. Contemplated surrender of property or consent to foreclosure. | |
| (xviii) | Stewart Avenue Acquisition, LLC | Formerly owned residential property | No assets or current operations. | |
| (xix) (xx) (xxi) (xxii) (xxiii) | Battle Creek Lake Acquisition Company, LLC North Tamarack Associates, L.L.C. River Properties of St. Paul LP Trooien & Associates LP Alexandra & Associates, L.L.C. West Biel 15.5 LLC West Biel 68 LLC | Vacant land subject to Dougherty Funding, LLC loan | Under negotiations with lender. These are related to Aperitif Restaurant in that the restaurant stands as additional collateral for these loans. The vacant real property will be surrendered. A deed in lieu of foreclosure agreement for the vacant land has been drafted and is under review. | |
| (xxiv) | Jerry Realty, LP | The Bridges of St. Paul | No assets or current operations. | |
| (xxv) | The Residences at The Bridges LP | The Bridges of St. Paul | No assets or current operations. | |
| (xxvi) | Jerry Realty Corporation | The Bridges of St. Paul | No assets or current operations. | |
| (xxvii) | Midway Warehouse, LP | Holding company | Non-operating company | |
| (xxviii) | Central Distribution, Inc. | Holding company | Non-operating company | |
| (xxix) | Corsair Aviation, LLC | Avaition company | Assets are ownership interests in non-operating entities. | |
| (xxx) | JLT Aircraft Holding Company, LLC | Avaition company | Assets in possession of lender, no operations. | |
| (xxxi) | Minnesota Choice Aviation II, LLC | Avaition company | Assets in possession of lender, no operations. | |
| (xxxii) | Minnesota Choice Aviation III, LLC | Avaition company | Assets in possession of lender, no operations. | |

| | ENTITY | PROJECT | COMMENTS | CASH IN ENTITY (1) |
|---|---|---|---|---|
| (xxxiii) | Summit Aircraft, LP | Avaition company | Holds ownership interests in Entities (xxxv), (xxxvi), (xxxvii), (xxxviii), (xxxix), (xl), and (xli) | |
| (xxxiv) | Summit Aircraft Corporation | Avaition company | Holds ownership interests in Entities (xxxiii), (xxxv), (xxxvi), (xxxvii), (xxxviii), (xxxix), (xl), and (xli) | |
| (xxxv) | Walker Aircraft, LLC | Avaition company | Assets in possession of lender, no operations. | |
| (xxxvi) | Helicopter Acquisition Company No. 3 LLC | Avaition company | No assets or current operations. | |
| (xxxvii) | Aircraft No. 1517 Company, LLC | Avaition company | Owns helicopter in Canada subject to sale, foreclosure or surrender. | |
| (xxxviii | Aircraft No. 1074 Company, LLC | Avaition company | Assets in possession of lender, no operations. | |
| (xxxix) | Helicopter Acquisition Company No. 1, LLC | Avaition company | No assets or current operations. | |
| (xl) | Helicopter Acquisition Company No. 2, LLC | Avaition company | No assets or current operations. | |
| (xli) | Aircraft No. 99 Company, LLC | Avaition company | Owns aircraft in possession of lessee, lender collects rent and applies against loan. Aircraft will be surrendered to lender at end of lease term. | |

Note (1) - Cash in Entity is ending book value as of March 9, 2011 and does not reflect tax appeals in process with respect to refunds which have not been received by the Entity. The majority of these properties are not disbursing funds for property tax or principal and interest payments at this time.

# PROPERTY TAX APPEAL STATUS

| Property | Case No. | Year Payable | Case Status | Taxable Market Value | Final Settlement Date | Final Settlement | Estimated Tax Savings | Tax Refund Received From County |
|---|---|---|---|---|---|---|---|---|
| 10 RPP LLC | 62-CV-08-3865 | 2008 | Settled | $33,417,300 | 12/1/10 | $24,500,000 | $309,432 | Yes |
| | 62-CV-09-4053 | 2009 | Settled | $33,878,300 | 12/1/10 | $23,500,000 | $355,968 | Yes |
| | 62-CV-10-2581 | 2010 | Settled | $33,878,300 | 12/1/10 | $22,500,000 | $401,688 | Yes |
| | 62-CV-10-11460 | 2011 | Settled | $32,628,300 | 12/6/10 | $21,000,000 | $436,221 | N/A |
| 331 Second Avenue, LLC (Tri Tech Building) | 27-CV-09-12207 | 2009 | Statutorily Dismissed (will not be reinstated) | $8,200,000 | 5/16/10 | $8,200,000 | $0 | |
| 3200 Como Assoc., LLC | 27-CV-09-12208 | 2009 | Pretrial 5/16/11 Trial Date Certain 7/12/11 | $2,875,000 | | | $0 | |
| | 27-CV-10-6040 | 2010 | Not yet scheduled | $2,875,000 | | | | |
| 676 Hotel, LLC | 82-CV-08-2880 | 2008 | Settled | $2,802,800 | 12/1/10 | $2,027,700 | $23,756 | No |
| | 82-CV-09-2328 | 2009 | Settled | $6,002,800 | 12/1/10 | $4,527,000 | $45,977 | No |
| | 82-CV-10-1954 | 2010 | Statutorily Dismissed; in process of reinstatement | $10,500,000 | | | | |
| 9800 Bren Property, LLC | 27-CV-09-12202 | 2009 | 2nd Setting 8/1/11 | $5,800,000 | | | | |
| Alexandra & Associates LLC | 62-CV-08-4933 | 2008 | Pretrial 7/5/11 | $1,968,000 | | | | |
| | 62-CV-09-4051 | 2009 | Statutorily Dismissed (will not be reinstated) | $1,968,000 | 5/16/10 | $1,968,000 | $0 | |
| | 62-CV-10-2571 | 2010 | Statutorily Dismissed | $1,968,000 | | | | |
| Battle Creek Lake Acquisition Co., LLC | 82-CV-08-2876 | 2008 | Dismissed | $1,010,000 | | | $0 | |
| | 82-CV-09-2407 | 2009 | Statutorily Dismissed (will not be reinstated) | $1,010,000 | 5/16/10 | $1,010,000 | $0 | |
| Bren Road, L.L.C. | 27-CV-09-12205 | 2009 | Dismissed | $9,250,000 | 12/7/09 | $9,250,000 | $0 | |
| Century & Lake Holding, LLC | 82-CV-08-2883 | 2008 | Dismissed | $2,679,400 | | | | |
| | 82-CV-09-2408 | 2009 | Statutorily Dismissed (will not be reinstated) | $2,679,400 | 5/16/10 | $2,679,400 | $0 | |
| | 82-CV-10-2465 | 2010 | Statutorily Dismissed | $2,679,400 | | | | |

| Property | Case No. | Year Payable | Case Status | Taxable Market Value | Final Settlement Date | Final Settlement | Estimated Tax Savings | Tax Refund Received From County |
|---|---|---|---|---|---|---|---|---|
| Fillmore & State Holding Company LLC | 62-CV-08-3862 | 2008 | Pretrial 4/21/11 | $4,536,600 | | | | |
| | 62-CV-09-4052 | 2009 | Statutorily Dismissed (will not be reinstated) | $4,669,200 | 5/16/10 | $4,669,200 | $0 | |
| | 62-CV-10-4656 | 2010 | 1st Setting 6/3/11 | $4,669,200 | | | | |
| | Not Yet Filed | 2011 | Not yet scheduled | $ 4,435,800 | | | | |
| Gerald L. Trooien & Janice Simmonds (Crow Wing) | 18-CV-08-2453 | 2008 | Dismissed | $684,700 | 11/6/09 | $684,700 | $0 | |
| | 18-CV-09-2149 | 2009 | Dismissed | $684,700 | 11/6/09 | $684,700 | $0 | |
| Gerald L. Trooien & Janice Simmonds (Summit Ave) | 62-CV-08-3856 | 2008 | Dismissed | $1,645,300 | 10/13/09 | $1,645,300 | $0 | |
| | 62-CV-09-4049 | 2009 | Dismissed | $1,406,600 | 10/13/09 | $1,406,600 | $0 | |
| JLT East River Road, LLC | 02-CV-09-3257 | 2009 | Pretrial 6/2/11 | $10,850,100 | | | | |
| | 02-CV-10-3074 | 2010 | 1st Setting 7/28/11 | $10,850,100 | | | | |
| JLT Mobil Building Limited Partnership | 62-CV-09-5139 | 2009 | Pretrial 5/3/11 | $7,138,000 | | | | |
| | 62-CV-10-4305 | 2010 | Not yet scheduled | $8,000,000 | | | | |
| Kennedy Building Associates | 27-CV-09-12206 | 2009 | Dismissed | $1,445,000 | 4/30/10 | $1,445,000 | $0 | |
| | 27-CV-10-6037 | 2010 | Dismissed | $1,445,000 | 4/30/10 | $1,445,000 | $0 | |
| North Tamarack Associates LLC | 82-CV-08-2882 | 2008 | Dismissed | $3,199,500 | | | $0 | |
| | 82-CV-09-2411 | 2009 | Statutorily Dismissed (will not be reinstated) | $6,474,000 | 5/16/10 | $6,747,000 | $0 | |
| | 82-CV-10-2473 | 2010 | Statutorily Dismissed | $6,474,000 | | | | |
| River Properties of St. Paul Limited Partnership | 62-CV-09-5142 | 2009 | Statutorily Dismissed (will not be reinstated) | $5,405,300 | 5/16/10 | $5,405,300 | $0 | |
| | 62-CV-10-4658 | 2010 | Statutorily Dismissed | $5,405,300 | | | | |
| JLT Roseville Corporate Center LLC | 62-CV-08-3859 | 2008 | Settled | $28,353,400 | 12/2/10 | $24,491,000 | $151,292 | Yes |
| | 62-CV-09-4050 | 2009 | Statutorily Dismissed (will not be reinstated) | $28,353,400 | 5/16/10 | $28,353,400 | $0 | |
| | 62-CV-10-4309 | 2010 | 1st Setting 6/10/10 | $28,353,400 | | | | |
| | 62-CV-10-11318 | 2011 | Not yet scheduled | $26,935,700 | | | | |
| | Not Yet Filed | 2012 | Not yet scheduled | $22,010,075 | | | | |

| Property | Case No. | Year Payable | Case Status | Taxable Market Value | Final Settlement Date | Final Settlement | Estimated Tax Savings | Tax Refund Received From County |
|---|---|---|---|---|---|---|---|---|
| Shepard Road Acquisition Co. LLC | 62-CV-08-4935 | 2008 | Pretrial 7/5/11 | $25,875,000 | | | | |
| | 62-CV-09-4054 | 2009 | Pretrial 7/5/11 | $28,462,500 | | | | |
| | 62-CV-10-2582 | 2010 | Pretrial 7/5/11 | $28,462,500 | | | | |
| Trooien & Associates LP | 82-CV-08-2879 | 2008 | Dismissed | $3,060,500 | | | | $0 |
| | 82-CV-09-2409 | 2009 | Statutorily Dismissed (will not be reinstated) | $3,060,500 | 5/16/10 | $3,060,500 | | $0 |
| | 82-CV-10-2467 | 2010 | Statutorily Dismissed | $3,060,500 | | | | |
| West Biel 68, LLC & West-Biel 15.5, LLC | 82-CV-08-2881 | 2008 | Dismissed | $11,837,400 | | | | $0 |
| | 82-CV-09-2410 | 2009 | Pretrial 3/23/11 Statutorily Dismissed (7 of 8 parcels will not be reinstated); One parcel remains active | $13,548,000 | | | | |
| | 82-CV-10-2470 | 2010 | Statutorily Dismissed | $15,481,200 | | | | $0 |

**EXHIBIT E**

## DEBT, BASIS, AND TAX ATTRIBUTES

| PROJECT | DEBT | BASIS | PASSIVE ACTIVITY LOSSES |
|---|---|---|---|
| 10 RPP, LLC (Revenue Building) | 32,640,991 | 8,663,334 | 5,695,610 |
| Fillmore & State Holding Company, LLC | 3,249,386 | 3,989,506 | |
| Shepard Road Acquisition Company, LLC | 31,225,500 | 13,306,702 | |
| 331 Second Avenue, LLC (TriTech) | 11,250,000 | 4,376,670 | |
| JLT Roseville Corporate Center, LLC | 20,766,439 | 16,741,919 | |
| 3200 Como Associates, LLC | 4,411,974 | 1,213,795 | |
| JLT Mobil Building Limited Partnership (Red Fox Road) | 7,014,925 | 6,870,988 | |
| JLT East River Road, LLC | 11,296,910 | 12,855,796 | 140,597 |
| Bren Road, LLC | 9,296,712 | 10,250,217 | |
| 9800 Bren Property, LLC (Gateway South) | 7,800,000 | 3,130,141 | 65,652 |
| Kennedy Building Associates | 1,156,177 | 181,482 | |
| 676 Hotel, LLC ("Sheraton St. Paul Woodbury Hotel") | 16,850,000 | 19,821,048 | 1,048,932 |
| Century & Lake Holding, L.L.C. | 2,048,735 | 2,145,664 | |
| Stewart Avenue Acqusition, LLC | | 95,264 | |
| Bielenberg Corporation | | | 7,508 |
| Parcels of land subject to Dougherty Funding, LLC loan | 32,000,000 | 31,601,980 | 777,745 |
| WCB Restaurant Company ("Aperitif"), West-Biel 15.5 LLC and West Biel 68, LLC | | 14,726,632 | - |
| Battle Creek Lake Acquisition Company, LLC | | 2,248,878 | - |
| North Tamarack Associates, L.L.C. | | 5,214,888 | - |
| River Properties of St. Paul, LP | | 8,124,369 | 289,940 |
| Trooien & Associates, LP | | 1,041,039 | 670 |
| Alexandra & Associates, L.L.C. | | 246,174 | 487,135 |
| The Bridges group of companies | | | 4,888,032 |
| Jerry Realty, LP | | | 133,636 |
| The Residences at the Bridges, LP | | | 4,705,758 |
| Jerry Realty Corporation | | | 1,106 |
| The Bridges Residences Corporation | | | 47,532 |
| Midway Warehouse LP | | | 1,220,493 |
| Central Distribution, Inc. | | | 596,139 |
| JLT Holding Company, Inc. | | | 2,230,187 |
| Team Parking LLC | | | 1,003,025 |
| NPD Real Estate Holding Company, LLC | | | 3 |
| Expenses paid to hold passive activites | | | 818,797 |
| Corsair Aviation, LLC | | | 3,805,502 |

| PROJECT | DEBT | BASIS | PASSIVE ACTIVITY LOSSES |
|---|---|---|---|
| JLT Aircraft Holding Co., LLC | 26,747,669 | 4,362,093 | 9,435,379 |
| Minnesota Choice Aviation II, LLC | 6,858,603 | - | 1,042,618 |
| Minnesota Choice Aviation III, LLC | 14,200,000 | 184,414 | |
| Summit group of companies | 19,309,676 | 12,535,471 | 4,479,778 |
|    Summit Aircraft LP | | | 4,440,422 |
|    Summit Aircraft Corporation | | | 39,356 |
|    Walker Aircraft, LLC | 9,097,403 | 6,796,161 | |
|    Helicopter Acq. Co. No. 3 LLC | 935,500 | 945,889 | |
|    Aircraft No. 1517 Company, LLC | 1,176,517 | 1,118,698 | |
|    Aircraft No. 1074 Co., LLC | 4,723,826 | 382,125 | |
|    Helicopter Acq. Co. No. 1 LLC | 950,000 | 951,125 | |
|    Helicopter Acq. Co. No. 2 LLC | 950,000 | 950,148 | |
|    Aircraft No. 99 Company, LLC | 1,476,430 | 1,391,325 | |
| Personal debt | 2,444,848 | | |
| TOTALS: | 260,568,545 | 152,326,484 | 37,255,997 |

| | |
|---|---|
| Passive loss carry-forwards | 37,255,997 |
| Net operating losses | 6,891,145 |
| At-risk losses | 1,340,317 |
| Capital loss carry-forwards | 364,694 |
| Total tax attributes available | 45,852,153 |

4897524_1

**EXHIBIT F**

# HYPOTHETICAL DISTRIBUTIONS

| Chapter 7 | | Chapter 11 | |
|---|---:|---|---:|
| Debtor Contribution | 1 | Debtor Contribution | 200,000 |
| Estate Assets | 1,776,200 | Estate Assets | 1,776,200 |
| | | | |
| Total Unsecured | 90,000,000 | Total Unsecured | 90,000,000 |
| Unsecured Recovery | 1,776,201 | Unsecured Recovery | 1,976,200 |
| % Recovery | 1.97% | % Recovery | 2.20% |
| | | | |
| | | Total Unsecured | 50,000,000 |
| | | Unsecured Recovery | 1,976,200 |
| | | % Recovery | 3.95% |

**Assumptions:**

| | | |
|---|---|---|
| Estimated allowed claims | $90,000,000 | (Hypothetical total allowed unsecured claims) |
| Estimated allowed claims with Debtor negotiation on personal guaranties | $50,000,000 | (Potential best case total allowed unsecured claims) |
| Debtor's payment for membership interests in chapter 11 | $200,000 | |
| Debtor's payment for membership interests in chapter 7 | $1 | |

**Table of Estate Assets:**

| | | |
|---|---|---|
| Cash on hand | $900,000.00 | (projected for June 1, 2011) |
| Nazca holdback | $750,000.00 | (maximum potential $1,000,000) |
| Private Bancorp shares | $75,000.00 | (rough estimate of illiquid shares) |
| Household goods | $25,000.00 | (estimated value less exemption, subject to appraisal) |
| Other Assets: | | |
| Cabin household goods | $27,000.00 | (scheduled amount, subject to appraisal) |
| Art | $23,500.00 | (scheduled amount, subject to appraisal) |
| Furs | $5,900.00 | (scheduled amount, subject to appraisal) |
| Car | $10,000.00 | (scheduled amount, subject to appraisal) |
| Boat and Dock | $11,000.00 | (scheduled amount, subject to appraisal) |
| Discount | ($51,200.00) | (Estimated 50% recovery on Other Assets) |